**ORIGINAL APPALACHIAN ART-
WORKS, INC., and Coleco
Industries, Inc., Plaintiffs,**

**v.**

**SCHLAIFER NANCE & COMPANY,
INC., Defendant.**

Civ. A. No. C 85–4336–A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 24, 1987.

Jerre B. Swann, Virginia S. Taylor, Kilpatrick & Cody, Atlanta, Ga., for plaintiff Original Appalachian Artworks.

Peter Q. Bassett, Alston & Bird, Atlanta, Ga., for plaintiff Coleco Industries.

Joseph C. Freeman, Jr., Stephen M. Lore, Freeman & Hawkins, Atlanta, Ga., for defendant, Schlaifer Nance & Co., Inc.

## ORDER

VINING, District Judge.

This action was originally brought as a declaratory judgment action by Original Appalachian Artworks, Inc. ("OAA") seeking a declaration of its rights and obligations under a contract it entered into with Schlaifer Nance & Company, Inc. ("SN & C") dated March 1, 1982, and subsequently amended on November 3, 1982,

and June 24, 1983.[1] Coleco Industries, Inc. ("Coleco") was subsequently joined as a plaintiff. SN & C answered the complaint and asserted a total of 25 counterclaims against OAA and Coleco. Pending before the court are OAA's and Coleco's motions for partial summary judgment with respect to the counterclaims asserted by SN & C.

## I. FACTUAL BACKGROUND

In mid–1977, Xavier Roberts began experimenting with soft sculpture techniques to make handmade needle-sculptured dolls. Roberts never used the term "doll" to refer to his works but, instead, identified them as "babies" and displayed them for "adoption" as if they were real human infants. The "babies" were sold at various arts and crafts shows and also at a craft store which Roberts managed. The early "babies" were priced from approximately $40 to $150, and each was signed on the buttocks by Roberts. Each "baby" was given a different name, and each "baby's" individuality and uniqueness were emphasized in presentations to potential customers.

By early 1978, Roberts had developed a design for what he regarded as an essentially perfected "baby." The proportions were similar to those of a human infant, and the "baby" employed a distinctive combination of facial and other body features. The physical features were produced by stuffing knitted fabric with polyester and shaping the fabric by means of needle-sculpturing. In February 1978, instead of continuing to create each baby as a new and separate work of art, Roberts began reproducing, with slight individual variances, the perfected prototype from patterns, and he began teaching employees and assistants to perform the various steps involved in producing the handmade "babies."

Roberts contends that he soon recognized that his strength was in the areas of creativity and marketing, and, therefore, in 1978, he began the process of forming a company and employing others to handle manufacturing, production of written materials, routine business, managerial, and financial aspects of company operations. The company was incorporated in the fall of 1978 as Original Appalachian Artworks, Inc.

In displaying and marketing his "babies" at craft fairs and art shows, Roberts told potential purchasers that he had found the babies in an enchanted Cabbage Patch, that he cared for them in "Babyland General Hospital," and that he was offering them for adoption to people who would promise to give them good homes. Purchasers were asked to take an oath of adoption, and the "babies" were given birth certificates and were sent birthday cards on the first anniversary of their adoption. The "babies" were sold under the trademark "The Little People," which was chosen for its connotation that the dolls were small, real people. By the end of 1978, Roberts had established a manufacturing facility and had begun distributing the "babies" through gift retail facilities known as "adoption centers." Each adoption center was required to commit completely to the myth, or "legend" that the "babies" had been found in the enchanted Cabbage Patch, thus treating the items as "babies" rather than as dolls.

The success of The Little People grew rapidly, and the unique marketing scheme of offering individually named "babies" for adoption and other aspects of the Cabbage Patch legend attracted extensive media attention. Gross retail sales of OAA's "babies" reached approximately $5 million in 1980 and approximately $10 million in 1981.

By 1980 and 1981, OAA was considering ways to expand its business activities, having recognized that the manufacture of handmade "babies" was highly capital and labor intensive; consequently, OAA was looking for business opportunities which would require less investment of capital and management energies on its part. OAA determined that licensing was a means of deriving income from intellectual

---

1. For convenience, this contract, as amended by these two subsequent amendments will be referred to simply as the March 1982 contract.

property based on an assumption of risk and expenditure of capital by other investors. Therefore, OAA began investigating possible licensing and franchising opportunities. During this time period, OAA also designed and produced other fabric-sculptured designs, some of which were identified as ancillary products to The Little People and others of which were entirely independent of and unrelated to The Little People. However, these other products enjoyed little success in the marketplace.

Early in its history, OAA became aware of the importance of securing and protecting exclusive rights to its artistic works through copyright ownership and to trademarks under which The Little People "babies" and other products were sold. OAA applied for and obtained a copyright registration for its needle-sculpture work, The Little People. OAA also applied for and obtained registration for the trademarks The Little People, Babyland General, Cabbage Patch, and other trademarks associated with its soft sculpture works.

In early 1981, Roger Schlaifer first contacted OAA to seek out OAA's advertising business. However, OAA rejected Mr. Schlaifer's original proposal, since it was doing its advertising internally at that time. Later in 1981, Mr. Schlaifer again contacted OAA about doing advertising and licensing work for OAA. Several meetings took place between Mr. Schlaifer and the principals of OAA, eventually leading to a contract between OAA and SN & C dated as of March 1, 1982.

Although Mr. Schlaifer, in the course of the contract negotiations, attempted to obtain licensing rights to Xavier Roberts' name and signature (sometimes referred to by the parties to this litigation as "Xavier Roberts plus design"), such inclusion was rejected by OAA. However, under the agreement SN & C did obtain the exclusive worldwide rights to license the designs, trademarks, and tradenames of OAA in the areas of subsidiary, literary, and audiovisual rights. The above terms are identified in paragraph 1 of the March 1982 contract as follows:

The term "DESIGN" shall mean designs derived from THE LITTLE PEOPLE, BABYLAND GENERAL HOSPITAL, CABBAGE PATCH, CABBAGE PATCH KIDS, PREEMIES, AND THE BABYLAND GENERAL STORK.

The term "SUBSIDIARY RIGHTS" shall mean the worldwide rights relative to the reproduction or use of Designs upon and in the form of greeting cards, posters, footwear, toys, games, three-dimensional figures, novelties, jewelry, clothing, wheel goods and accessories and other similar products.

The terms TRADEMARKS and TRADENAMES shall mean the marks and names THE LITTLE PEOPLE, BABYLAND GENERAL HOSPITAL, CABBAGE PATCH, CABBAGE PATCH KIDS, PREEMIES, and STORK.

The term LITERARY RIGHTS shall mean the rights to authorize third parties to prepare and reproduce materials in literary form based on the Designs, Trademarks and Tradenames of Producer [OAA].

The term AUDIO VISUAL rights shall mean the rights to authorize third parties to produce materials in audio visual form based on the Designs, Trademarks and Tradenames of Producer.

In 1981, and in early 1982, while OAA was engaged in discussions with Mr. Schlaifer regarding his desire to serve as its licensing agent, OAA was also in the process of finding an alternative name to The Little People, which would not be preempted in collateral product markets and would be more protectable than The Little People. The new name, Cabbage Patch Kids, was adopted in early 1982.

It was about this time that the "legend" or story line as originally developed by Xavier Roberts was embellished and expanded. The story goes that Xavier Roberts, as a young boy, lived in the mountains of north Georgia and, while strolling through the woods, saw a flying creature which resembled a bumblebee but with bunny ears for wings (called "Bunny-Bees"). Following this creature to a secret entrance surrounded by kudzu, young Xa-

vier found himself in the Cabbage Patch, which is a mythical land inhabited by the Cabbage Patch Kids. The BunnyBees Xavier had spotted are magical flying creatures which fly over the Cabbage Patch sprinkling magic crystals, which pollinate the cabbage buds and result in the birth of Cabbage Patch Kids. Overseeing this mythical kingdom and acting as narrator for many of the Cabbage Patch Kids stories is Colonel Casey the Stork, who delivers the Cabbage Patch Kids to Babyland General Hospital, an institution that young Xavier founded for the purpose of placing Cabbage Patch Kids in good, loving homes.

Also at this time, different logos, artwork, and graphics were developed for use in licensing the Cabbage Patch Kids merchandise. Among the items developed were the logos and hang tag designs for Cabbage Patch Kids, Preemies, and Bunny-Bees.

In June 1982, Mr. Schlaifer contacted Coleco Industries, Inc., a leading toy company, which expressed interest in the Cabbage Patch property. During the summer of 1982, SN & C, OAA, and Coleco engaged in negotiations for a substantial licensing agreement involving the Cabbage Patch Kids. These discussions led to a licensing agreement, in letter form, between SN & C and Coleco, which was dated August 8, 1982. This agreement, as required by the March 1982 contract between OAA and SN & C, was approved by OAA.

Shortly after the August 8 agreement was entered into, Coleco began to adapt the Cabbage Patch Kids babies for the mass market. One of the primary adaptations was to make each baby's head out of vinyl instead of fabric. Coleco created a series of variations in the basic head style in an attempt to maintain the individuality and diversity of the original babies. These variations, along with differences in hairstyle, apparel, hair and skin color, and presence or absence of such details as freckles and dimples, helped to maintain Roberts' original theme that no two babies were completely alike. The limbs and bodies were reproportioned slightly, but the use of a soft, needle-sculptured cloth body was re-

tained to maintain the cuddly feel of the original babies. The size of the Coleco babies was reduced approximately five inches so as to be easier for a small child to handle.

Coleco packaged the babies in distinctive boxes adorned with a series of illustrations of Cabbage Patch Kids, a drawing showing Xavier Roberts finding the Cabbage Patch, an abbreviated version of the legend of how the Cabbage Patch Kids were found and adopted out to families, and a message from the Cabbage Patch Kids baby to the adoptive parent on the side of the box. Like the original babies, the Coleco Cabbage Patch Kids also had Xavier Roberts' signature on each of the babies' buttocks, although the signature on these babies was mass produced instead of being individually signed by Mr. Roberts.

The process of adapting the original babies for mass marketing by Coleco was closely supervised in order to insure consistency with the original concepts. The adoption and individual name aspects of the original Cabbage Patch Kids trade dress were also maintained by providing each Coleco Cabbage Patch Kid with a birth certificate showing that the "baby" whose individual name was shown on the birth certificate was "born in the Cabbage Patch" on a particular date. Furthermore, each "baby" was also provided with "adoption papers," including an "oath of adoption" to be taken by the new "parent" who could then mail the papers to Babyland General Hospital and receive an official Cabbage Patch Kids "adoption certificate."

Market research established that the individuality and the adoptability of the Cabbage Patch Kids, together with their somewhat homely appearance, were crucial characteristics of the "babies" and generated the reaction that they were "real" babies, not mere dolls.

The Cabbage Patch Kids were the most popular Christmas toy for 1983, with the demand far exceeding the supply. The dolls were so successful that it was necessary to withdraw all television advertising because there was insufficient stock to supply the demand. Demand for the Cabbage

Patch Kids remained high throughout 1984, with the shortage being particularly acute during the 1984 Christmas season.

The phenomenal success of the Cabbage Patch Kids products in 1983 resulted in an enormous number of inquiries from potential licensees, and licenses were granted in almost every major category of children's products within a short period of time thereafter. By Christmas 1983, SN & C had already sold a significant number of its most important licensed categories.

After the Coleco Cabbage Patch Kids product approval process and SN & C's licensing program were well under way, OAA continued to create and develop other designs for manufacture and sale. OAA in fact manufactured and sold two series of Debonair Bears at Babyland General Hospital; however, this bear was a rather stiff, standing figure, and OAA was interested in developing a softer, more cuddly bear which would have more of a teddybear-type appeal.

In consultation with Xavier Roberts, a designer employed by OAA designed a plush fabric bear with only the soles of its feet, muzzle, and stomach being comprised of a contrasting smooth polyester fabric to give the appearance of skin. The bear was named Humphrey Furskin and wore a T-shirt bearing this name. OAA began manufacturing and selling Humphrey Furskin bears at Babyland General Hospital in 1983.

Although OAA sent a prototype of the Humphrey Furskin bear to Coleco to explore whether Coleco might be interested in manufacturing the product, Coleco expressed little interest in doing so.

OAA soon determined that the Humphrey Furskin product, both because of its relatively unsophisticated style and the expensive domestic hand-sewing methods by which it was made, was not suitable for mass marketing either as a gift product or as a toy. Consequently, OAA sought to obtain the expertise of artists experienced in designing products suited to mass production. After conducting extensive independent research and working closely with OAA personnel in developing the details of

color, texture, style, and appearance, these consultants produced a prototype of the current Furskins Bear design.

The story line developed for the Furskins bears resembled that of the conventional story-based toys such as Paddington Bear and Winnie-the-Pooh. Furthermore, the Furskins bears were assigned a limited number of names, with each named character having fixed personal characteristics. Unlike the Cabbage Patch Kids, each of which was regarded as an individual and no two of which were alike in name or personality, the original series of Furskins bears had only four characters, each with a preassigned personality, name, and story.

When Coleco became aware of OAA's plans to produce the Furskins bears, it contacted OAA and asserted its position that OAA did not have the right to produce that product on its own. However, after fuller discussions between OAA and Coleco, Coleco eventually withdrew its contention that the contract giving it exclusive authority to produce and market Cabbage Patch Kids also gave it the exclusive right to produce and market the Furskins bears.

The Furskins bears were introduced at a toy fair in February 1985 and enjoyed a significant degree of initial success. OAA entered into negotiations with various toy companies which were interested in producing a smaller version of the Furskins bears and eventually negotiated a contract with Coleco in the fall of 1985, licensing the production of a smaller version of the Furskins bears to Coleco.

OAA contends that at this time it was growing increasingly dissatisfied with the services of SN & C as a licensing agent for its Cabbage Patch Kids properties and, therefore, had no interest in allowing SN & C to serve as its licensing agent for the Furskins products. However, SN & C took the position that its contractual right to be the exclusive licensing agent for Cabbage Patch Kids products also gave it the right to be the exclusive licensing agent for the Furskin bears. SN & C's position is based upon its contention that the Furskins are merely derived from the Cabbage Patch Kids and thus are covered under the March

1982 contract and the August 8, 1982, contract.

When the parties were unable to resolve their disputes regarding their rights under the various contracts, OAA filed this action for declaratory judgment. SN & C counterclaimed asserting various federal and state law claims against both OAA and Coleco. OAA and Coleco moved for partial summary judgment against SN & C on 21 of the 25 counterclaims, and those motions are now before the court.[2] Since some of the counterclaims overlap, the court has grouped them for discussion and analysis.

## II. LEGAL DISCUSSION

### A. Copyright Infringement (Count 1 and Count 3)

In Count 1 of its counterclaim SN & C asserts a claim for copyright infringement against OAA and Coleco under the Copyright Act of 1978, 17 U.S.C. § 501(a). SN & C argues that the contract between Coleco and OAA which granted a license to Coleco for the manufacture and sale of Furskins bears constitutes an infringement of SN & C's exclusive licensing rights of the Cabbage Patch Kids property, which SN & C claims is protected by section 501(a). As an underpinning for this argument SN & C claims that Furskins bears are "derived from" the Cabbage Patch Kids property. SN & C asserts that it, therefore, has the same exclusive rights in Furskins that it has in Cabbage Patch Kids. In addition, SN & C claims that Coleco's failure to pay SN & C its share of the royalties earned by Coleco from the sale of the Furskins bears constitutes an

infringement under section 501(a). These two series of acts form the basis for the relief sought in Count 1 of SN & C's counterclaim.

To redress the alleged infringements, SN & C requests that the court declare the above acts to be violations of section 501(a), permanently enjoin OAA and Coleco from future infringements of SN & C's copyright interests, order OAA and Coleco to account for all profits derived from the alleged infringements, and award actual or statutory damages.

In Count 3 SN & C argues that OAA breached its March 1982 contract with SN & C by failing to register SN & C's copyright. The contract between SN & C and OAA provides that OAA has sole responsibility for the "[r]egistration of copyrights." SN & C claims that, to the extent that it had a copyright interest, OAA's failure to record it with the appropriate governmental agency was a breach of contract. To resolve whether SN & C's claim for copyright infringement against OAA and Coleco and its corresponding claim for breach of contract against OAA survive a motion for summary judgment, the court need only evaluate whether the Copyright Act of 1976 protects the rights asserted by SN & C.

To prevail on a copyright infringement claim under section 501(a), a litigant must demonstrate a violation of the exclusive rights provided in sections 106 through 118. SN & C argues that its exclusive rights to license others to use the copyright at issue is one of the "bundle of rights" protected by section 106.[3]

---

**2.** In its response to the motions SN & C conceded that it has developed no facts to support Count 20 of its counterclaim (breach of contract by OAA with respect to exclusive licensing rights in the "crafts" area); consequently, the court will grant OAA's motion for summary judgment on that count as unopposed.

**3.** That section provides as follows:
Subject to sections 107 through 118 [which are inapplicable in this ligitation], the owner of a copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyright of working copies or phono records;

(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phono records of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images or a motion

SN & C maintains that its rights are "clearly" protected by section 106 while at the same time tacitly admitting that section 106 does not expressly cover its rights. Rather, SN & C emphasizes the fact that the five protected rights in section 106 are "stated generally," are capable of being "subdivided indefinitely" while still receiving full protection under section 501, and are cumulative and overlapping. SN & C therefore concludes, on the basis of the expansive language describing the section 106 rights, that its exclusive right to authorize others to use OAA's copyright must in itself be a copyright within section 106 and, thus, protected by section 501.

The cases cited by SN & C in support of this expansive interpretation of copyright are inapposite. *Wales Industrial, Inc. v. Hasbro Bradley, Inc.*, 612 F.Supp. 510 (S.D.N.Y.1985), dealt with distribution rights, which are expressly covered by section 106, and *Burns v. Rockwood Distributing Co.*, 481 F.Supp. 841 (N.D.Ill.1979), dealt with the manufacture, sale, and distribution rights, which are also expressly covered by section 106.

On the basis of the plain wording of section 106 (and in the absence of case law supporting SN & C's arguments), this court concludes that any rights which SN & C possesses with respect to the copyrights involved in this litigation are derived solely from the March 1982 contract with OAA and not from the copyright laws. Therefore, SN & C is not a copyright owner and, consequently, lacks standing to bring a section 501(a) action. *See Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir.1982).

Because SN & C has no copyright under section 106, it necessarily follows that OAA has no liability, under Count 3, for failure to register the copyright.

For the foregoing reasons OAA's and Coleco's motions for summary judgment as to Counts 1 and 3 of the counterclaim are GRANTED.

**B. Breach of Contract, Conspiracy to Breach Contract (Count 2), and Tortious Interference with Business Relationships (Counts 7 and 8)**

In Count 2 of its counterclaim, SN & C alleges that OAA breached the March 1982 contract which gave SN & C the exclusive right to license the designs, copyrights, trademarks, and trade names which derive from or pertain to[4] the Cabbage Patch Kids property and that Coleco conspired with OAA to breach that contract. SN & C asserts that the Furskins bears are derived from the Cabbage Patch Kids property, and, as a result, SN & C owns the exclusive right to license interests related to the Furskins bears. Therefore, SN & C argues that the Furskins bears contract between OAA and Coleco, constitutes a breach of the March 1982 contract because SN & C was deprived of an opportunity to license a product derived from the Cabbage Patch Kids.

---

picture or other audiovisual work, to display the copyrighted work publicly.

**4.** The March 1982 contract between OAA and SN & C uses the terminology "derived from" in defining the scope of products covered. The August 8, 1982, agreement wherein Coleco was granted a license to manufacture, sell, and distribute certain articles uses the terminology "pertaining to." SN & C has specifically conceded that OAA was not a party to the August agreement. SN & C's Brief in Opposition to OAA's Motion for Partial Summary Judgment at 29. Of course, OAA approved the agreement, since OAA had retained the right, in the March agreement, to approve the granting of all licenses by SN & C. SN & C argues that by approving a license for the manufacture and sale of products "pertaining to" Cabbage Patch Kids, OAA implicitly expanded the coverage of the March agreement from "products derived" from Cab-

bage Patch Kids to all those products "pertaining to" Cabbage Patch Kids. The court rejects this argument.

It is undisputed that OAA specifically and adamantly refused to include in the March 1982 agreement a right to license Xavier Roberts' name and signature. It stretches credulity to imagine that OAA would grant such a right a few months later without a more explicit provision. But of greater significance, in considering a motion for summary judgment, is the fact that SN & C has presented no evidence whatsoever that in approving the August agreement OAA intended (or any party assumed at the time that OAA intended) to broaden the March agreement to include items "pertaining to" Cabbage Patch Kids. In deciding this issue, the court assumes, without deciding, that "pertaining to" is more expansive than "derived from."

In Count 7 of its counterclaim SN & C alleges that OAA's contracting with Coleco constitutes tortious interference with business relations between SN & C and Coleco, and in Count 8 SN & C alleges that Coleco's contracting with OAA constitutes tortious interference with business relations between SN & C and OAA. The substance of the interference, according to SN & C, is that both OAA and Coleco were obligated to include SN & C in the Furskins bears contract; alternatively, if they were not obligated, Coleco and OAA induced each other not to enter into a business relationship with SN & C regarding the Furskins bears property, each thereby interfering with SN & C's business relationship with the other.

Central to determining whether OAA breached its contract with SN & C, whether Coleco conspired with OAA to breach the contract,[5] and whether OAA and Coleco tortiously interfered with SN & C's business relationships is the question of whether the Furskins bears are derived from the Cabbage Patch Kids property. For instance, if it is determined that no genuine issue of material fact exists with respect to the Furskins bears not being derived from the Cabbage Patch Kids property, then any contract entered into by Coleco and OAA regarding the Furskins bears could not be a breach of the March 1982 contract dealing with the Cabbage Patch Kids property. The conspiracy claim would also be eviscerated if there were no breach of contract. Correspondingly, if it is determined the Furskins bears constitute an original work and are not derived from Cabbage Patch Kids, and that OAA and Coleco were not

actually bound to include SN & C in the Furskins bears contract, then there would be no tortious interference with any of SN & C's business relationships with Coleco and OAA.

As the court indicated in section II–A above, this case is essentially a contract case, not a copyright case. When a contract term is in dispute, as is the term "derived from" in this case, a court employs certain principles of contract interpretation to define the meaning of the disputed term. One of the principles is that words "generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed generally, to be used in reference to this peculiar meaning." O.C.G.A. § 13–2–2(2).

In support of its motion for summary judgment, OAA assumes without discussion, that the definition of "derived from" is contained in section 101 of the Copyright Act of 1978,[6] which, in actuality, defines a "derivative work". In response, SN & C argues that "derived from" has a more expansive meaning than "derivative work", and because OAA used "derived from" and not "derivative work" in the contract, it is improper to look to section 101 for the definition of "derived from." SN & C, however, fails to specify where the definition of "derived from" is located. Instead, SN & C simply states, " '[D]erived from' ... by its plain meaning is broader than the statutory term of art 'derivative work'." (SN & C's Response in Opposition to OAA's Motion for Partial Summary Judgment, p. 45). SN & C offers no evidence or case law in support of this inter-

---

**5.** While Georgia courts have recognized that a conspiracy to breach a contract is actionable, the courts have tacitly acknowledged that such an action in conspiracy is essentially the same as an action for tortious interference with business relations. In *Georgia Power Co. v. Busbin*, 145 Ga.App. 438, 244 S.E.2d 26 (1978), the court approved a jury instruction delivered by a trial court regarding the appropriateness of a conspiracy action against a defendant. In finding no error in the charge, the court cited with approval *Luke v. Dupree*, 158 Ga. 590, 124 S.E. 13 (1924), which is commonly recognized as the leading Georgia case on tortious interference with business relations.

**6.** Section 101 of the Copyright Act of 1978 reads as follows:

A derivative work is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaboration, or other modification which as a whole represents an original work of authorship, is a "derivative work."

pretation. Implicit in SN & C's rationale is its concern that section 101's definition of "derivative work" may not allow SN & C to prevail in its argument that the Furskins bears are derived from Cabbage Patch Kids.

After considering the distinction advocated by SN & C, the court is simply unable to find the difference between "derived from" and "derivative work" which SN & C regards as obvious. Moreover, at least one other court has observed that works "derived from" copyrighted material are in fact "derivative works." *See, e.g., Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191 (7th Cir.1987). Therefore, the court holds as a matter of law that "derived from" and "derivative work" are synonymous and are simply different grammatical constructions of the same concept. Consequently, the court also holds that section 101, together with the remainder of the Copyright Act of 1978 and the case law interpreting it provide the basis for determining whether the Furskins bears are derived from the Cabbage Patch Kids property.

It is a well-settled tenet of copyright law that a work is not derivative unless it is substantially similar to the work that it is derived from. *See Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir.1984), and the cases cited therein. The court perceives no reason to deviate from this tenet. Therefore, reduced to its purest form, the issue facing the court is whether the Furskins bears, the alleged derivative work, are substantially similar to the Cabbage Patch Kids, the original work.

The Second Circuit observed that " 'Substantial similarity' exists where 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.' " *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 911 (2d Cir.1980), *quoting Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092–93 (2d Cir.1977). In *Original Appalachian Artworks, Inc. v. Toy Loft*, 684 F.2d 821, 829 (11th Cir.1982), the Eleventh Circuit adopted in its entirety the standard laid out by the Second Circuit.

The court recognizes as well established the proposition that issues of substantial similarity are fact issues generally left for jury resolution. *See Warner Brothers v. American Broadcasting Companies*, 720 F.2d 231, 239 (2d Cir.1983). That is not to say, however, that issues of substantial similarity always present a jury question. A court may grant a motion for summary judgment on the issue of substantial similarity when no reasonable juror, properly instructed, could find that the two works at issue are substantially similar. 720 F.2d at 240. It is not unprecedented for a court, on a summary judgment motion, to engage in a visual comparison to determine if the "total concept and feel" of the work in question is substantially similar to that of another work. *Warner Brothers v. American Broadcasting Companies*, 654 F.2d 204, 211 (2d Cir.1981). Given this precedential support, the court will undertake a comparison to determine whether reasonable minds could differ as to the substantial similarity of the two works at issue in the case *sub judice*.

The Furskins bears are stocky, animal-like figures covered predominately with thick fur, except for portions of the ears, paws, muzzle, and belly, which are covered with a fabric to give the appearance of flesh. The Cabbage Patch Kids (including The Little People) are baby-like figures with human features. Their bodies are constructed entirely of fabric to produce a human flesh type appearance.

There are many detail-specific differences between the two works. The Cabbage Patch Kids have inverted U–shaped eyes with small pupils on a white background. Their faces exhibit child-like features—small noses, pudgy cheeks, small recessed mouths with overbites and no chins. They have small hands and feet with stubby fingers and toes. Their extremities have been sculptured to exhibit human-like features such as thighs, knees, ankles, elbows, wrists, and navels. Their backsides have also been sculpted to resemble buttocks upon which the Xavier Roberts signature is printed. Some of the kids are bald; others have hair made of yarn.

Some have ears; others do not. Their attire is typical infant wear, complete with infant shoes and disposable diapers.

The bears have large, circular eyes with no white background. Their large, furry ears and paws are accented with the skin-type fabric which is sculptured to provide realistic detail. The Xavier Roberts signature is sewn into the bears' left hind paw. Their protruding bellies are also made of the skin-type fabric and have a navel sculptured in the center. The bears' noses and mouths are sculptured into the fabric covering the large muzzles, which protrude from the bears' large, furry heads. At each bear's rear end is a rather stout tail. The bears wear casual, rural clothing not unlike what would be worn by persons living in rural communities. The bears also wear hats of various styles and what might best be described as hunting or hiking boots.

█ The court does recognize, however, that there are some similarities between the works as the plaintiff argues. Both works share some common bonds in fantasy, legend, motif, tradedress, packaging, needle sculpturing, and "Appalachian country flavor." But, as the following discussion illustrates, these similarities do not rise to the level of "substantial."

The Cabbage Patch Kids, according to the "legend," are rather homely but cute and vulnerable human babies who are born in an enchanted cabbage patch, and then later taken to Babyland General Hospital where they are cared for, individually named, and offered for adoption to deserving adoptors. Although the "babies" are named at the hospital, the adopting individuals are encouraged to give the "babies" personalities of their own; the dolls are not assigned any traits, characteristics, or roles by the manufacturer. Each doll is also a "one of a kind" production. These factors, especially the adoption concept, are regarded as the essence of Cabbage Patch Kids, making them different from all other dolls on the market.

On the other hand the Furskins bears, according to their "legend," are basically a clan of self sufficient bears who live in a remote, back-woods town called Moody Hollow. Unlike the Cabbage Patch Kids, each bear has a predefined personality and occupation or title (*e.g.*, postmaster, store manager, beekeeper, beauty queen, etc.). The bears are also not adopted; in fact, the clan is reputed to have never had contact with humans. Each bear is also not one of a kind; there are innumberable Farrell, Boone, Hattie, and Dudley Furskins in existence.

The Furskins are packaged and prominently displayed in a simulated wood grained, open front cardboard box. On the back of the box is the Furskins family portrait which pictures the entire clan of some 12 bears situated in front of the Moody Hollow General Store. On the box is printed a description of the bears, the legend of Moody Hollow, and several of the Furskins bears logos.

The Cabbage Patch Kids are also packaged in an open front box for display purposes. On the back of the box is the legend of the Cabbage Patch Kids and a cartoon depicting Xavier Roberts discovering the enchanted Cabbage Patch. Several of the Cabbage Patch logos are printed on the box as well as cartoon representations of the actual Cabbage Patch Kids.

There is no doubt that the Furskins bears packaging incorporates ideas used in the Cabbage Patch Kids packaging scheme (*i.e.*, large open front boxes, legends and logos affixed thereto, etc.). However, these similarities are simply trivial surface similarities which, far from being indicia of the Furskins bears being derived from the Cabbage Patch Kids, indicate only that both works share a common authorship.

To the extent the similarities in packaging and otherwise are variations on ideas or themes and not actual copies of the expressions, "substantial similarity" under the Copyright Act of 1978 cannot be said to exist. If the court were viewing this as a copyright infringement case, it could not hold that the similarities between the Furskins bears and the Cabbage Patch Kids were substantial enough to constitute a copyright violation of the Cabbage Patch Kids copyright. Any similarities are,

again, only variations on ideas and are not actually copies of any particular expression. It is well settled that the latter would necessitate a finding of substantial similarity whereas the former would not. *See, e.g., Franklin Mint Corp. v. National Wildlife Art Exchange,* 575 F.2d 62, 65–66 (3d Cir.1978).

The court must, therefore, conclude that the absence of substantial similarity between the Furskins bears and Cabbage Patch Kids is fatal to SN & C's claim that the Furskins bears are derived from the Cabbage Patch Kids property.

Because the court holds as a matter of law that the Furskins bears are not derived from the Cabbage Patch Kids, there is no basis for SN & C's contention that it was entitled to participate in marketing the Furskins bears under the March 1982 contract. Since OAA did not breach the March 1982 contract in giving Coleco the right to manufacture and sell Furskins bears, it necessarily follows that Coleco did not conspire with OAA to induce OAA to breach the March 1982 contract.

SN & C argues in the alternative that "Coleco induced OAA not to enter into a business relationship with Defendant [SN & C] regarding the licensing of the 'FURSKINS' property." Counterclaim ¶ 100. Because there can be no liability simply for encouraging a party not to enter into a contract, this bare allegation arguably would not state a claim for relief. Consequently, in its answers to interrogatories, SN & C seeks to salvage this claim by explaining the alleged tortious interference as follows:

> It had been agreed between Coleco and SN & C that Coleco was to deal with OAA regarding the "Furskins" and that Coleco would be sure that SN & C was not deprived of its rights. Coleco did not honor this agreement.

The terms of this "agreement" are further explained by Susan Schlaifer in her deposition wherein she states that because relations between OAA and SN & C were so hostile SN & C's participation in the Furskins bears negotiations would have foreclosed any possibility of success; SN & C

therefore agreed to "sit tight" with the understanding that Coleco was "going to try and work this out with OAA, and ... would try to cut Schlaifer Nance in on the deal." (Susan Schlaifer deposition at 113.)

Even assuming that Coleco did not honor this "agreement" such action by Coleco would, at the most, state a claim for breach of contract (assuming further that such agreement was supported by consideration); however, the failure to honor this "agreement" would not constitute a tortious interference with business relationship as alleged by SN & C.

For the foregoing reasons OAA's and Coleco's motions for summary judgment as to Counts 2, 7, and 8 are GRANTED.

### C. Quantum Meruit and Unjust Enrichment Claims with Respect to the Furskins Bears (Counts 14 and 15)

In Counts 14 and 15 of its counterclaim SN & C argues in the alternative that, in the event the Furskins bears are determined not to be derived from the Cabbage Patch Kids property and SN & C, therefore, has no entitlement to any royalties or other benefits derived from the sale of the Furskins, it would nevertheless be entitled to compensation for benefits derived from the utilization of SN & C's work on the Cabbage Patch Kids property which benefitted the Furskins products.

In viewing the evidence and allegations most favorably to SN & C, the court determines that there are genuine issues of material fact regarding whether (1) SN & C conferred a cognizable benefit upon OAA and Coleco, (2) the extent to which, assuming that a benefit was conferred, OAA and Coleco were enriched by such a benefit, (3) whether OAA's and Coleco's alleged receipt of the benefit was unjust, and (4) whether SN & C conferred the benefit in a manner which would allow it to recover under either a theory of unjust enrichment or quantum meruit. Of course, the burden will be on SN & C to prove how its efforts on behalf of the Cabbage Patch Kids program directly benefited the Furskins program. Furthermore, SN & C will be required to elect at trial whether it wishes to

proceed under the theory of unjust enrichment or quantum meruit.

For the foregoing reasons, OAA's and Coleco's motions for summary judgment on Counts 14 and 15 of the counterclaim are DENIED.

### D. Lanham Act Violation (Count 12) and Deceptive Trade Practices under Georgia Law (Count 13)

■ In Count 12 of its counterclaim SN & C advances the alternative argument that, in the event the court determines that SN & C has no exclusive contract rights to license the Furskins bears, OAA's and Coleco's actions in marketing, advertising, and promoting the Furskins bears constitute a violation of the Lanham Act, 15 U.S.C. § 1125. SN & C alleges that OAA and Coleco knowingly designed and approved a trade dress for the Furskins bears which was deceptively similar to that used in the Cabbage Patch Kids property. The result was a marketing scheme and trade dress which, SN & C charges, tended to and, in fact, did deceive the purchasing public, thereby resulting in a diversion of sales from the Cabbage Patch Kids property to the Furskins bears. Therefore, SN & C argues, OAA and Coleco have committed unfair competition, false description, and false representation.

Because this court has determined that SN & C has no contract right to license Furskins bears since they are not derived from Cabbage Patch Kids property, it is not "premature" (to use SN & C's word) for this court to determine whether the counterclaim survives OAA's and Coleco's motions for summary judgment.

In pertinent part, section 1125 reads as follows:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall have knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

SN & C claims that it is a member of that second class of individuals who have a cause of action under section 1125 in that SN & C believes that it has been or is likely to be damaged by the use of the allegedly false descriptions or representations. SN & C, in its Brief in Opposition to OAA's Motion for Summary Judgment, goes to great lengths to establish a set of facts which would support a cause of action under section 1125. However, even the use of a sophisticated and involved argument cannot create a cause of action where none exists. If there is one immediately apparent characteristic of section 1125, it is that in order to sustain a cause of action thereunder, a plaintiff must establish the existence of some type of false designation, description, or representation. The operative word is "false."

In its brief SN & C purports to establish the requisite false representation by arguing that OAA and Coleco created an impression among the purchasing public that Furskins bears are Cabbage Patch Kids products. In developing this argument, SN & C relies exclusively on marketing research which reveals that a significant percentage of the purchasing public regard Furskins bears as associated with Cabbage Patch Kids property. Those factors which SN & C argues create this association are the use of the Xavier Roberts signature on the Furskins bears, the cuteness and loveability of the bears, and the soft sculptured technique employed in their manufacture.

OAA does not deny that the above-cited characteristics are reminiscent of the Cabbage Patch Kids property. In fact, it is highly probable that OAA and Coleco man-

ufactured the Furskins bears and incorporated some of these characteristics to capitalize on the popularity of the Cabbage Patch Kids. However, if these characteristics are indicative of anything, they are indicative of the fact that the Furskins bears share a common heritage with the Cabbage Patch Kids. As OAA states, there is absolutely nothing false about this association. Additionally, there is absolutely no evidence that any purchasers of Furskins bears were deceived or were misled into believing that they were purchasing Cabbage Patch Kids when, in fact, they were purchasing Furskins bears. Consequently, the court determines as a matter of law that SN & C has failed to establish the predicate of falsity in order to prevail on its Lanham Act claim.

With respect to SN & C's allegation that OAA's and Coleco's actions violated Georgia's Deceptive Trade Practices Act, O.C. G.A. § 10–1–372, this court notes that that statute involves "the same dispositive question as the federal Lanham Act." *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 839 (11th Cir.1983). Since the court has found that OAA and Coleco did not violate the Lanham Act, it necessarily follows that they did not violate the Georgia statute.

For the foregoing reasons, OAA's and Coleco's motions for summary judgment as to Counts 12 and 13 are GRANTED.

E. Breach of Contract by OAA in Competing Directly Against Cabbage Patch Kids Licensees and Conspiracy by Coleco (Count 16)

■ In Count 16 of its counterclaim SN & C alleges that the March 1982 contract prohibits OAA from competing directly in the mass market with Cabbage Patch Kids licensees in the manufacture, sale, and distribution of Cabbage Patch Kids products. OAA has countered by claiming that it has the right to produce Cabbage Patch Kids products for sale in the mass market.

SN & C has identified three separate factual situations which arguably support its claim for breach of contract by OAA. First, SN & C contends that Coleco's manufacturing of the Furskins bears, to the

extent that the bears are derived from the Cabbage Patch Kids, constitutes direct competition with the Cabbage Patch Kids property. Second, SN & C argues that OAA has repeatedly and unreasonably refused to approve licenses for the production of articles that might compete with the sale of the OAA original Little People "babies." Third, SN & C alleges that OAA's actions in independently producing a Cabbage Patch Kids one-hour television special constitutes a violation of the covenant not to compete directly with Cabbage Patch Kids licensees.

Turning to the first set of factual circumstances in support of SN & C's claim, the court finds it necessary simply to refer to language contained in SN & C's Brief in Opposition to OAA's Motion for Summary Judgment. SN & C relies on the "derived from" language contained in the March 1982 contract to support its contention in Count 16 that the Furskins bears compete with Cabbage Patch Kids products. At page 86 of its brief SN & C states, "SN & C does insist that any creative endeavor on the part of OAA which is 'derived from' CABBAGE PATCH would 'compete with' and 'impair' SN & C's rights under the parties' 3/1/82 Agreement." Because the court has already determined in section II–A above that the Furskins bears are not derived from the Cabbage Patch Kids property, it is apparent from SN & C's own argument that it cannot recover under the first rationale.

In support of its second rationale, SN & C contends that OAA unreasonably refused to approve licenses for products that would compete with OAA's Little People "babies." However, SN & C cites no situations wherein OAA purportedly unreasonably refused to approve any such licenses; the only examples given by SN & C relate to licensing the Xavier Roberts signature. As noted earlier in this order, OAA had not given SN & C the right to license this mark; consequently, OAA could properly withhold its approval of such licenses.

Under the third rationale supporting Count 16, SN & C asserts that OAA's and Coleco's agreement to produce a Cabbage

Patch Kids television special, which agreement contemplated the payment to Coleco of a fee for the overseeing and distribution of the television special, constituted a breach by OAA of its covenant not to compete with Cabbage Patch Kids property and a corresponding conspiracy on the part of Coleco. These allegations also form the basis for Count 17 of SN & C's counterclaim. SN & C makes no showing as to how the production of the television special would violate the March 1982 contract's prohibition against producing products that would compete with the Cabbage Patch Kids products. These factual allegations simply state a cause of action for breach of contract with respect to SN & C's rights under the March 1982 contract to license audiovisual rights. Consequently, this court holds that insofar as SN & C alleges a breach of contract and conspiracy to breach with respect to the production of the television special, such causes of action are subsumed in Count 17 of the counterclaim and will not provide a basis for recovery under Count 16.

For the foregoing reasons, OAA's and Coleco's motions for summary judgment as to Count 16 are GRANTED.

F. Breach of Contract by OAA in Violating the Terms of the Contract with respect to Entertainment Rights and Conspiracy by Coleco (Count 17)

In Count 17 of its counterclaim SN & C alleges that OAA has undertaken to negotiate Cabbage Patch Kids licenses in the entertainment area independently of SN & C, specifically that OAA and Coleco entered into an agreement whereby OAA would independently produce a Cabbage Patch Kids one-hour television special, the production of which would be funded by Coleco. SN & C alleges that these actions constitute a breach of contract by OAA and also evidence a conspiracy between OAA and Coleco to breach the contract. As the court has noted earlier in this opinion, in order for a conspiracy to be considered actionable, there must be an underlying breach of contract or a tort. Since OAA has not moved for summary judgment with respect to this claim, the court will assume

that there is a genuine issue of material fact with respect to the breach of contract claim against OAA. Since there may be an underlying actionable breach of contract, the court concludes that it would be appropriate to deny Coleco's motion for summary judgment on the conspiracy claim so that the facts may be more fully developed at trial. *See United States v. Merchants National Bank of Mobile*, 772 F.2d 1522 (11th Cir.1985).

For the foregoing reasons, Coleco's motion for summary judgment on Count 17 is DENIED.

G. Quantum Meruit and Unjust Enrichment in Regard to the Entertainment Claims (Counts 18 and 19)

SN & C alleges that, pursuant to its purported exclusive right to license productions in the entertainment area, it has engaged substantial time, effort, and money in seeking to negotiate contracts in this area. SN & C argues that if the court determines that SN & C does not possess such exclusive licensing rights, then it is entitled to remuneration from OAA and Coleco in quantum meruit or unjust enrichment for the services it rendered.

Since the court has determined in section II–E of this order that there are genuine issues of material fact regarding the breach of contract and conspiracy claims, the court deems it inappropriate to rule on the merits of the alternative grounds for relief presented by SN & C. The court finds that there are sufficient allegations asserted by SN & C to withstand a motion for summary judgment on the quantum meruit and unjust enrichment claims. Of course, SN & C can recover on only one of the three grounds. At trial the jury will be instructed that SN & C may recover on its quantum meruit or unjust enrichment claim only if the jury finds that there was no breach of contract. Furthermore, SN & C cannot recover under both quantum meruit and unjust enrichment but will be required at trial to elect under which of these remedies it wishes to proceed.

For the foregoing reasons, OAA's and Coleco's motions for summary judgment on

Counts 18 and 19 of the counterclaim are DENIED.

### H. Breach of Oral Contract by Coleco and Promissory Estoppel by Coleco (Counts 10 and 11)

In Count 10 of its counterclaim SN & C alleges that Coleco offered to include SN & C in any business arrangement that Coleco might enter into with OAA regarding the Furskins bears. SN & C further alleges that its forebearance in instituting legal action against Coleco or OAA to protect its rights under the March 1982 contract was sufficient consideration to support the oral contract made by Coleco. SN & C concludes that Coleco's failure to include it in the business arrangement ultimately agreed upon by Coleco and OAA with regard to the Furskins constituted a breach of the oral contract between Coleco and SN & C.

In order for SN & C to prevail on its allegations of breach of oral contract, SN & C must establish both that the contract was sufficiently definite in its terms and that the purported consideration was adequate. It is a well established principle of Georgia law that for an oral contract to be enforceable there must be mutuality of agreement. *Venable v. Block*, 138 Ga.App. 215, 217, 225 S.E.2d 755 (1976). To establish the existence of an oral contract SN & C points to a series of discussions with Coleco. SN & C alleges that during the course of these discussions Coleco made representations to the effect that SN & C would be "cut in on" any deal which would eventually be made with OAA. In the words of Susan Schlaifer, "SN & C [agreed] to sit tight and would let Coleco try to work something out." Susan Schlaifer Deposition, p. 121. SN & C now argues that these statements by Coleco are sufficient to form an oral contract.

The Eleventh Circuit in *American Viking Contractors, Inc. v. Scribner Equipment Co.*, 745 F.2d 1365 (11th Cir.1984), reviewed a district court's grant of summary judgment in a case involving an oral contract. The district court held that the parties had essentially agreed only to agree in the future. The district court further

held that the agreement was too indefinite to be enforceable. Concluding that there were no genuine issues of material fact regarding the absence of an oral contract the court granted summary judgment. The Eleventh Circuit affirmed, stating, "[U]nless all terms and conditions are agreed upon and nothing is left to future negotiations, a contract to enter into a contract in the future is a nullity." 745 F.2d at 1370. The court finds the instant case to be indistinguishable from *American Viking*. At most, Coleco and SN & C simply agreed that Coleco would attempt to consummate some sort of deal in the future which, if at all possible, would include the participation of SN & C. Simply stated, Coleco did no more than agree with SN & C to enter into an agreement with OAA at some point in the future. Correspondingly, Coleco's use of such words as "try" and "negotiate" indicates that there was no definite and, therefore, enforceable agreement as to exactly what Coleco would do.

Even if the terms of the contract were sufficiently definite to support the existence of an enforceable contract, a grant of summary judgment in favor of Coleco would still be appropriate since the oral contract was not supported by adequate consideration. SN & C argues that its forebearance in not bringing suit is, in fact, adequate consideration. However, *Holsomback v. Caldwell*, 218 Ga. 393, 395, 128 S.E.2d 47 (1962), indicates that SN & C's forebearance is not valid consideration. *Holsomback* arose out of marital discord whereby the wife left her husband. Following the separation, the wife agreed to resume the marital relationship and abandoned her plans to divorce the husband upon the husband's promise that he would will to her all of his property and would deed their home to her. The husband, however, failed to execute such a will and also failed to execute a deed of the home to the wife. The husband and wife were later killed in an automobile accident. The wife's estate then sued the husband's estate claiming that there was a valid oral contract between the two parties in that it was supported by adequate consideration. The asserted consideration was the wife's

forebearance from instituting a divorce action when she agreed to return and resume marital relations with her husband.

In addressing the validity of the consideration, the Georgia Supreme Court noted that the wife had simply promised to return to her husband and perform the duties which she had promised to perform at the time the couple were married. The court noted that in order for the wife's consideration to be valid she would have had to have forfeited her right to a divorce. Under the facts of that case, the court held that there existed no grounds sufficient to entitle her to a divorce (*i.e.,* cruel treatment, adultery, etc.). In essence, the court held that where the holder of the alleged cause of action would be unable to prevail in that cause of action, forebearance in not bringing that cause of action is not valid consideration. The court succinctly stated its rationale as follows:

> The rationale of this rule is twofold: (1) that the dismissal of a meritorious action or a forebearance to sue is, in and of itself, a valid consideration; (2) that, after a separation resulting from wrongful acts by the husband to his wife, the husband is no longer entitled to his wife's services; hence, her consent to a resumption of the marital relations is valuable consideration. This is the general rule adhered to in the majority of jurisdictions.

218 Ga. at 395, 128 S.E.2d 47.

Therefore, in order for SN & C's forebearance to be valid consideration, the cause of action which SN & C alleges it could have brought must be meritorious.

The cause of action which SN & C alleges it could have brought against either Coleco or OAA is that it could have sued under the March 1982 contract to enforce its rights with respect to the Furskins bears. However, as the court has already discussed earlier in this order, SN & C had absolutely no rights under the March 1982 contract regarding the Furskins bears because the Furskins bears are not derived from the Cabbage Patch Kids. Consequently, SN & C's asserted forebearance was only forebearance from bringing a non-meritorious action, which *Holsomback* indicates is not valid consideration. Consequently, no valid oral contract came into existence.

In *American Viking,* the Eleventh Circuit held that under Georgia law for a litigant to prevail under a theory of estoppel a litigant's reliance must be reasonable and justified. The court held there, as a matter of law, that reliance upon indefinite and, therefore, unenforceable representations is not justified. Consequently, SN & C's theory of estoppel is without merit because the representations, as a matter of law, were "incapable of satisfying the inducement element necessary for a valid estoppel defense." *American Viking,* 745 F.2d at 1372.

For the foregoing reasons, Coleco's motion for summary judgment as to Counts 10 and 11 is GRANTED.

### I. Fraud by Coleco and Conspiracy to Commit Fraud by OAA (Count 5) and Fraud by OAA (Count 6)

In Counts 5 and 6 of its counterclaim SN & C relies upon the same basic facts involved in the breach of oral contract and promissory estoppel claims in Counts 10 and 11 which were discussed above. With respect to the fraud which SN & C alleges Coleco committed, it is necessary that SN & C demonstrate that its reliance upon Coleco's representations was justifiable. *American Viking Contractors, Inc. v. Scribner Equipment Co.,* 745 F.2d 1365 (11th Cir.1984). As this court held in regard to the promissory estoppel count, SN & C's reliance upon Coleco's indefinite promises to engage in negotiations with OAA make that count unenforceable; likewise, this court holds that SN & C could not have reasonably relied upon those representations and promises. The representations were simply too indefinite to support reasonable reliance. Therefore, Coleco is entitled to summary judgment on Count 5. OAA is likewise entitled to summary judgment because as the court has noted previously in this order a conspiracy cannot exist without establishing the underlying tort or breach of contract. Because Coleco did not commit the tort of

fraud against SN & C, OAA could not have conspired to commit the tort.

SN & C has also alleged, in Count 6, that OAA defrauded SN & C. In its brief in support of its motion for summary judgment, OAA notes that SN & C has failed to plead fraud against OAA with the requisite specificity. In fact, during Susan Schlaifer's deposition, counsel for OAA posed the following question: "Could you tell me each intentional misrepresentation of fact which OAA has made to Schlaifer Nance that you intend to encompass by that paragraph [paragraph 19 in SN & C's answer and counterclaim charging OAA with fraud]?" Ms. Schlaifer responded "I don't think I can at this point in time." Since SN & C has not sought to amend its counterclaim to allege with particularity any facts to support its claim of fraud, OAA is entitled to summary judgment.

For the foregoing reasons, OAA's and Coleco's motions for summary judgment on Counts 5 and 6 of the counterclaim are GRANTED.

### J. Defamatory Injury to Business Reputation by OAA (Count 9)

 In Count 9 of its counterclaim SN & C alleges that OAA made public statements to the effect that SN & C did not have the capacity to handle the task of licensing the Furskins bears. SN & C alleges that these statements are false, were made with actual malice, and were made with knowledge of their falsity. SN & C further alleges that as a result of OAA's disparaging remarks about its capabilities SN & C has suffered damage to its reputation in the commercial community.

In both the brief offered in support of the motion for summary judgment and the brief offered in opposition to the motion for summary judgment, the only statement identified which purports to defame SN & C is one contained in a December 18, 1984, issue of The Wall Street Journal. This article quotes Xavier Roberts as saying, "Roger [Schlaifer] has his hands full already." OAA contends that the reference to Mr. Schlaifer's having his hands full already simply refers to the fact that SN & C had sent letters to several persons who had requested that SN & C handle their products and that SN & C in turning down those offers of business had stated that it was too busy with the Cabbage Patch Kids licensing effort to accept any new jobs. OAA further contends that Xavier Roberts made the statement regarding Roger Schlaifer having his hands full only because SN & C had sent out these letters declining to take on any new accounts.

In opposing summary judgment on this issue, SN & C argues that Susan Schlaifer, in her deposition, testified that in addition to The Wall Street Journal article which allegedly defamed SN & C, there were at least two or three other articles which appeared in the trade media which also referred to SN & C's apparent inability to handle any further licensing contracts. However, those additional articles have not been identified. In addition, there have been no factual allegations made which would support an inference that the statements were made maliciously, intending to injure the reputation of SN & C, or exposing SN & C to public hatred. SN & C then states in its brief in opposition to the motion for summary judgment that no additional facts have been developed in the record which would support its claim for defamation.

The court holds that SN & C has failed to raise a genuine issue of material fact with regard to the veracity of Xavier Roberts' statements contained in The Wall Street Journal article of December 18, 1984. The statement attributed to Mr. Roberts is virtually identical to statements made by Mr. Schlaifer. There is no basis for a jury to find that Mr. Roberts' statement was false.

For the foregoing reasons OAA's motion for summary judgment as to Count 9 of the counterclaim is GRANTED.

### K. Breach of Contract by OAA (Count 24)

 SN & C alleges that because of the enormous success of the Cabbage Patch Kids program many third parties have produced and sold products that have infringed upon the Cabbage Patch Kids copyrights, trade names, and trademarks. In

order to protect the rights of all parties involved in the Cabbage Patch Kids licensing program OAA has instituted numerous infringement actions against such parties. SN & C alleges that in many of these infringement cases, OAA has entered into settlement agreements whereby the alleged infringer is allowed to sell off its existing inventory and either pay to OAA a dollar figure per unit sold in previous and existing inventory or a fixed sum of money for all sales made. SN & C contends that such settlements are tantamount to the granting of temporary licenses by OAA to the infringing third parties and that the settlement agreements thereby violate SN & C's contractual right to act as exclusive licensor for the Cabbage Patch Kids property (subject to certain exceptions not applicable in this litigation).

OAA contends that SN & C is not entitled to share in any of the settlement proceeds because SN & C has not shared any of the costs of litigating those lawsuits. In support of its position, OAA relies upon paragraph 15 of the agreement between SN & C and Coleco, dated August 8, 1982. That paragraph provides as follows:

If Licensee notifies Licensor of any infringement by others of the rights licensed hereunder, and Licensor shall fail to either stop such an infringement or bring or maintain action against the infringer within a period of thirty (30) days after such notification, then Licensee shall have the right to pursue such action on its own behalf. In any such suit by Licensee, Licensee shall bear all of its expenses and costs and shall keep all the recovery of the action. Should Licensor bring an action, Licensee shall have the right to be represented by its own attorneys at its own expense. At the inception of any such action by Licensor, Licensee shall have the option, exercisable by giving written notice to Licensor within the ten (10) days of receipt of written notice of such action, to share half the cost of the action and half of any recovery from the action. If the Licensee does not exercise the option, it shall not share in the recovery. In the event Licensee brings suit, Licensor and/or OAA

shall have the right to be represented by its own attorneys at its own expense.

In an earlier paragraph of that agreement the Licensor is identified as SN & C, and the Licensee is identified as Coleco. Paragraph 15, quoted above, by its clear, unambiguous terms is applicable only in situations wherein an infringement action is brought by SN & C or Coleco. That paragraph in no way obligates SN & C to share in the cost of litigation in order to be entitled to any share of settlement proceeds, but, conversely, there is nothing in that paragraph that would entitle SN & C to share in any settlement proceeds from infringement suits prosecuted by OAA. Any such entitlement to settlement proceeds must be found in the March 1982 contract between OAA and SN & C.

The March 1982 contract grants to SN & C the exclusive right to license persons to use designs and trademarks and trade names of OAA while providing that it is the "sole responsibility" of OAA to enforce its copyrights and trademarks. Since that contract grants to SN & C the exclusive right to license the products identified therein, OAA would be in breach of that contract if it granted temporary licenses to infringers to market products derived from the Cabbage Patch Kids program. However, SN & C would be entitled only to a proportionate share of the settlement funds that would be attributed to the grant of a temporary license. To the extent that part of the settlement proceeds would be to compensate OAA for its expenses in litigating the matter to conclusion, SN & C would not be entitled to any share of those proceeds. Additionally, "expense" as used in the preceding sentence must be viewed in its broadest sense and not restricted merely to dollars actually expended in prosecuting the litigation. Although the calculation of monies that would be owed to SN & C might be difficult, such difficulty does not provide a basis for holding, on a motion for summary judgment, that SN & C is not entitled to such proceeds.

Since OAA may be liable to SN & C for a portion of settlement proceeds properly attributable to the grant of temporary licens-

es to infringers, OAA's motion for summary judgment with respect to Count 24 of SN & C's counterclaim is DENIED.

### L. Breach of Contract by Coleco—Technical Assistance (Count 25)

In Count 25 of its counterclaim SN & C contends that Coleco violated the terms of the August 8, 1982, contract by entering into "technical assistance" agreements whereby the foreign licensees agreed to pay funds in addition to the regular royalties for such technical assistance.

It is uncontested that during 1983 eleven Cabbage Patch Kids foreign licensees were offered technical assistance contracts by Coleco's Canadian subsidiary. These agreements provided that Coleco would be paid 2% of net sales of Cabbage Patch Kids products in exchange for Coleco's providing technical services and assistance for pack-out procedures, packaging, quality control, and development of promotional material and point of purchase displays. The August 8 agreement provides that Coleco is to pay SN & C a royalty of 3.5 percent of net sales, with "net sales" being defined as the gross invoice price billed on all shipments of the licensed articles or billed for the use of licensed articles.

This court cannot say as a matter of law that the "technical assistance" agreements were not, in fact, a method by which Coleco could generate additional income for itself by charging additional monies for the licensed articles and avoiding paying SN & C its royalty share of such additional monies. Coleco cannot disguise a portion of its net sales as "technical assistance" income if, in actuality, such income should have been included as a part of net sales. Whether such additional income was properly excluded from net sales or should have been included is a question for the jury.

For the foregoing reasons, Coleco's motion for summary judgment on Count 25 of the counterclaim is DENIED.

### M. Breach of Warranty and Conspiracy to Breach by OAA and Coleco (Count 4)

In Count 4 of its counterclaim, SN & C alleges that OAA has breached paragraph 13 of the March 1982 contract wherein OAA warranted that it would not "knowingly (directly or indirectly, through employees, agents, firms or corporations controlled by it), by any act or omission, do anything which would impair the rights created in this contract." SN & C also alleges that Coleco conspired with OAA to breach OAA's warranty in paragraph 13.

Paragraph 13 does no more than impose the common law requirement that parties to a contract act in good faith in fulfilling the terms of the contract. To the extent that OAA by any act or omission has done anything to impair any right of SN & C under the March 1982 contract, SN & C has a cause of action for that particular breach.

For this reason, this court holds that any cause of action which SN & C might have against OAA for breach of paragraph 13 or against Coleco for conspiracy is subsumed in its other counterclaims for breach of contract and for conspiracy. Since no separate cause of action exists for breach of the warranty in paragraph 13, OAA and Coleco are entitled to summary judgment on this counterclaim.

For the foregoing reasons, OAA's and Coleco's motion for summary judgment as to Count 4 of the counterclaim is GRANTED.

### III. SUMMARY

In summary, OAA's motion for summary judgment as to Counts 1, 2, 3, 4, 5, 6, 8, 9, 12, 13, 16, and 20 of SN & C's counterclaim is GRANTED; OAA's motion for summary judgment as to Counts 14, 15, and 24 is DENIED. Coleco's motion for summary judgment as to Counts 1, 2, 4, 5, 7, 10, 11, 12, 13, and 16 of SN & C's counterclaim is GRANTED; Coleco's motion for summary judgment as to Counts 14, 15, 17, 18, 19, and 25 is DENIED.