**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 95-8960
_____

D. C. Docket No. 1:93-cv-1868-ODE

CAMP CREEK HOSPITALITY INNS, INC.
d.b.a. SHERATON INN ATLANTA AIRPORT,

Plaintiff-Appellant,

versus

SHERATON FRANCHISE CORPORATION, ITT SHERATON
RESERVATIONS CORPORATION, SHERATON SAVANNAH
CORPORATION, and ITT SHERATON CORPORATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

**(April 30, 1998)**

ON PETITIONS FOR REHEARING

Before BIRCH and CARNES, Circuit Judges, and MICHAEL[*], Senior District Judge.

BIRCH, Circuit Judge:

# Defendant-appellee's petition for rehearing is denied. Plaintiff-Appellant's petition for

---

[*]  Honorable James Michael, Senior U.S. District Court Judge for the Western District of Virginia, sitting by designation.

rehearing is granted. Our opinion entered December 11, 1997 and published at 130 F.3d 1009 is vacated. The following opinion is entered in lieu thereof:[1]

## INTRODUCTION

Camp Creek Hospitality Inns, Inc. ("Camp Creek") appeals the district court's grant of summary judgment in favor of Sheraton Franchise Corporation, ITT Sheraton Reservations Corporation, Sheraton Savannah Corporation, and the ITT Sheraton Corporation (collectively "Sheraton"),[2] arguing that genuine

---

[1] On petition for rehearing, appellant Camp-Creek argues that our earlier opinion overlooked evidence in support of their claims for tortious interference with contract. We agree, but note that our oversight does not affect the outcome of the case.

[2] Sheraton Franchise Corporation ("Sheraton Franchise"), ITT Sheraton Reservations Corporation ("Sheraton Reservations"), and Sheraton Savannah Corporation ("Sheraton Savannah"), are affiliated with or wholly-owned subsidiaries of the ITT Sheraton Corporation ("ITT Sheraton").

issues of material fact remain with respect to each of its claims. Camp Creek also appeals the district court's decision to dismiss its motion to compel discovery as moot. We affirm in part and reverse in part.

Our review of the district court's grant of summary judgment is plenary, but we apply the same legal standards that bound the district court. See Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989). The purpose of a motion for summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986). A dispute over an issue of material fact is genuine if the evidence would permit a reasonable jury to return a verdict for the party against whom summary judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986). In reviewing the district court's grant of summary judgment

we must review the evidence and all reasonable factual inferences in the light most favorable to the party opposing the motion. See Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). If, however, the evidence of a genuine issue of material fact is "merely colorable" or of insignificant probative value, summary judgment is appropriate. See Liberty Lobby, Inc., 477 U.S. at 249-50, 106 S. Ct. at 2511.

## BACKGROUND

In September 1990, Camp Creek entered a series of agreements with Sheraton that authorized Camp Creek to establish and operate a Sheraton Inn franchise (the "Inn") approximately 3.5 miles west of the Atlanta airport. Camp Creek entered into a License

Agreement with Sheraton Franchise that permitted Camp Creek to operate its property under the Sheraton name in exchange for the payment of various franchise royalties. The License Agreement required Camp Creek to enter a separate contract with Sheraton Reservations that permitted the Inn to participate in Sheraton's nationwide reservations system (the "Reservatron system") for the payment of additional associated fees. Camp Creek's participation in this system allowed Sheraton's agents to accept reservations on the Inn's behalf using occupation and pricing data that Camp Creek supplied to Sheraton Reservations.

Camp Creek was not the only Sheraton property in the vicinity of the Atlanta airport in

1990; the Sheraton Hotel Atlanta Airport (the "SHAA"), another franchisee, already served that market.  Although Sheraton distinguishes between inns (mid-price properties) and hotels (higher-end properties) within its own system, Sheraton's concerns about potential customer confusion led to some disagreement over the Inn's name.  Camp Creek, which wanted to confirm its presence near the airport in the minds of potential guests, sought a name that would include an "Atlanta Airport" designator. The License Agreement, however, gave Sheraton Franchise control over the name and, to avoid confusion among Sheraton customers, the parties agreed upon the "Sheraton Inn Hartsfield-West, Atlanta Airport."  Although there is evidence to support Sheraton's

contention that Camp Creek initially was happy with this designation, by early 1992 Camp Creek had begun to ask permission to change its name to "Sheraton Inn Atlanta Airport," based on its contention that travelers did not associate "Hartsfield-West" with the airport. Sheraton Franchise agreed to the change in the Inn's name with the express reservation that the decision was subject to reconsideration should the change create customer confusion.

In 1992, Camp Creek experienced two problems in connection with its participation in the Sheraton Reservatron system. First, Sheraton's representatives failed to book reservations for the Inn over a period of time because an error led them to believe the Inn was fully booked. Sheraton Reservations

7

claimed that the problem was rooted in the computer software but refused to provide compensation or further explanation for the problem. At approximately the same time, Camp Creek received erroneous charges for reservations that, the parties later discovered, were due to confusion in the American Airlines SABRE reservations system. A stern warning from Sheraton Reservations prompted Camp Creek to pay the charges and pursue a refund. After encountering delays and intransigence from Sheraton, Camp Creek eventually recovered some credit for the billing error.

In March 1992, Sheraton began to consider acquiring a hotel property, then operating under the Hyatt flag, in the vicinity of the Atlanta Airport. Sheraton's interest was apparently

sparked by Hyatt's willingness to sell the property at a substantial discount. Various members of ITT Sheraton's staff evaluated the proposal, both at their corporate headquarters in Boston, Massachusetts and in Atlanta, where they traveled to study competitive properties. The evidence, viewed in the light most favorable to Camp Creek, shows that ITT Sheraton's representatives did not visit the Inn to evaluate whether the new hotel would compete against the Inn; similarly, ITT Sheraton's internal evaluations of the project did not seriously consider the competitive harm that might befall the Inn if the property converted to the Sheraton flag. The appellees maintain that it never viewed the Hyatt property as a threat to the Inn because Sheraton

9

expected the property's connection to the Georgia International Convention Center to attract predominately group business.

The evidence also suggests that at least one of the ITT Sheraton employees working on the Hyatt acquisition may have viewed the Inn and the SHAA as potential obstacles to the project's success. David Proch-Wilson, who was primarily responsible for the acquisition, prepared a series of documents that indicated a desire, first, to eject both franchises from the Sheraton system, alternatively, to convert the SHAA to an Inn if it elected to remain a Sheraton franchise, and finally, to require Camp Creek to change the Inn's name back to "Sheraton Inn Hartsfield-West." Indeed, in February 1993, Sheraton Franchise informed

Camp Creek that the Inn's name would be changed to "Sheraton Inn Hartsfield-West," citing customer confusion between the two Sheraton franchises already in the area. In the same month, Sheraton Franchise offered the SHAA the opportunity to reclassify itself as an Inn in the Sheraton system. Camp Creek immediately protested the change in its name. In correspondence to Sheraton Franchise, Camp Creek demanded evidence of customer confusion and offered to work with Sheraton to resolve any other factors giving rise to confusion. Camp Creek maintained that guests did not associate the "Hartsfield-West" designator with the Atlanta Airport and that the change would threaten its business. Although the evidence on this point is in some dispute,

Camp Creek apparently did not change the Inn's name on its signs and shuttle vans and continued to answer the phone using the Atlanta Airport designator. Nevertheless, the Inn's name did change in the Reservatron system and in Sheraton's nationwide advertising. Sheraton Franchise never provided documentation of specific instances of customer confusion and in April 1994 agreed to permit the Inn's name to revert to "Sheraton Inn Atlanta Airport."

Meanwhile, in April 1993, ITT Sheraton consummated its acquisition project by purchasing the Hyatt property. Sheraton Savannah became the owner of the hotel and began operating it under the name "Sheraton Gateway Hotel, Atlanta Airport" (the "Gateway")

on May 1, 1993.  The record suggests that the presence of a third Sheraton property in the Atlanta Airport market caused some customer confusion and that Camp Creek suffered some decrease in the growth of its business, particularly in its higher-end business.  Although the parties cannot agree on the extent of the problems, Camp Creek presented evidence that suggests a number of guests who had reservations at the Inn actually stayed at the Gateway at rates equivalent to or lower than the Inn's rates, and often at rates below the Gateway's "walk-in" rate.

Although ITT Sheraton had expected the Gateway to be profitable almost immediately, it soon became clear that the Gateway would not live up to projections.  Tom Faust, the manager

13

of the Gateway, blamed at least part of the Gateway's poor performance on competition from the Sheraton franchises, particularly the SHAA, and he proposed that Sheraton eliminate both franchises. The evidence also shows that Faust, who had previously been responsible for Sheraton Reservations, had access to confidential, competitively sensitive information from the Reservatron system concerning the franchises, and that he used this information to support his argument for ejecting the franchises from the Sheraton system. Sheraton, however, never adopted Faust's proposal.

The evidence, construed in Camp Creek's favor, shows that the Gateway could have made use of this confidential information to compete against the Inn. Moreover, an

14

analysis of the Gateway's actual performance shows that the two properties do compete for customers in a number of market segments. Sheraton denies that Faust made any competitive use of the Inn's confidential information and maintains that, although the Gateway did offer lower prices for a time, it did so only to attract first-time customers who might return at higher prices.

Camp Creek has also presented evidence that suggests Sheraton has taken actions to favor the Gateway, Sheraton's own property, over the Inn. Although Sheraton maintains that its Reservations software displays the properties in the Atlanta Airport market in a random fashion and that its agents have no means by which to distinguish franchises from corporate hotels, Camp Creek has presented

15

evidence of almost 300 test calls that suggest the agents disproportionately list the Gateway as the first choice to callers inquiring about reservations. Camp Creek also has presented evidence that Sheraton's nationwide advertising favored the Gateway over both the SHAA and the Inn.

Finally, Sheraton's evidence shows that the Inn's overall economic performance has continued to improve since the Gateway opened. Camp Creek's experts, however, have suggested that the Inn experienced abnormally high no-show and cancellation rates, that the Inn has not grown at the rate projected, and that it has failed to achieve a reasonably desirable mix of business, so that even though occupancy rates have remained high, the Inn

would have been substantially more profitable had the Gateway never entered the market as a Sheraton property.

## DISCUSSION

As an initial matter, we note that Camp Creek's amended complaint sets forth a myriad of statutory and common law claims under Massachusetts, Georgia, and federal law based on the common nucleus of facts described above. Although the complaint and the record in this case are complicated and voluminous, Camp Creek's allegations boil down to the basic proposition that the defendants, by establishing and operating a competing Sheraton hotel in the Atlanta Airport market, violated one or more of the duties (sounding in contract, tort, or both) that a franchisor owes to

17

its franchisee. We examine these broad contentions before addressing Camp Creek's more discrete claims for relief.

## I. The Implied Covenant of Good Faith and Fair Dealing (Counts I, II and X-A)

Camp Creek claims that, although Sheraton's conduct may not have contradicted the express terms of the License Agreement or Reservations Agreement, Sheraton nonetheless violated the covenant of good faith and fair dealing that is implicit in every contract under Massachusetts law. First, Camp Creek argues that Sheraton's decision to establish and operate the Gateway in the Atlanta Airport market breached this implied covenant. Second, Camp Creek submits that even if

Massachusetts law does not prohibit a franchisor's encroachment relative to the facts of this case,[3] a number of acts incident to Sheraton's competition with Camp Creek constitute independent breaches of the implied covenant of good faith.  We address each claim in turn.

## A.    Sheraton's Establishment of the Gateway Hotel (Count I)

As the License Agreement contains no covenant not to compete and does not grant the Inn an exclusive territory, Camp Creek does not contend that Sheraton violated any express term of the License Agreement by establishing and operating the Gateway Hotel.  Instead,

---

[3]  We adopt the term "encroachment" only as it has evolved in the cases and academic commentary discussing the issues before us. Our use of that term is not intended to attribute impropriety (or the lack thereof) to the defendants' actions in this case.

Camp Creek relies on the implied covenant of good faith and fair dealing and argues that, by establishing the Gateway in such proximity to the Inn, Sheraton denied Camp Creek the fruits of the contract.[4] Sheraton replies that it did not deny Camp Creek any benefit under the contract and argues that the implied covenant, as applied by Massachusetts courts, may not be employed to rewrite the express terms of a contract.

We note that Massachusetts does imply a covenant of good faith and fair dealing in all contracts. See Fortune v. National Cash Register Co., 364 N.E.2d 1251, 1256 (Mass. 1977) (recognizing good faith and fair dealing

---

[4] Although Camp Creek only entered into the License Agreement with Sheraton Franchise, it is clear from the contract and the nature of the relationship, that Sheraton and its affiliates are contemplated in the contract and incurred rights and liabilities under that agreement. See e.g.,License Agreement ¶ 1.

as "pervasive requirements" in Massachusetts law.) This covenant requires parties to contracts to deal honestly and in good faith in the performance and enforcement of their agreements, see Hawthorne's, Inc. v. Warrenton Realty, Inc., 606 N.E.2d 908, 914 (Mass. 1993), and to refrain from impairing the other party's right to receive the fruits of the contract, see Larson v. Larson, 636 N.E.2d 1365, 1368 (Mass. App. Ct. 1994) (quoting Anthony's Pier Four, Inc. v. HBC Assoc., 583 N.E.2d 806, 820 (Mass. 1991)). The covenant of good faith, however, may not be used to rewrite or override the express terms of a contract. See e.g., Zapatha v. Dairy Mart, Inc., 408 N.E.2d 1370 (1980) (rejecting a franchisee's challenge to its termination

pursuant to the express terms of the franchise agreement).

Although the parties have brought a great deal of persuasive authority to our attention, they have cited no Massachusetts case that applies the covenant of good faith to facts similar to those present here. The great weight of authority on applying the implied covenant of good faith and fair dealing to cases of encroachment converges around two fairly simple propositions: (1) when the parties include contract language on the issue of competing franchises the implied covenant will not defeat those terms;[5] and (2) when there is

---

[5] See, e.g., Cook v. Little Caesar Enterprises, Inc., 972 F. Supp. 400, 409 (E.D. Mich. 1997) (franchisor did not engage in bad faith by locating another franchise outside the one mile "exclusive territory" granted to the franchisee in the contract); Payne v. McDonald's

22

no such language the franchisor may not

capitalize upon the franchisee's business in bad

faith.[6]  See <u>Piantes v. Pepperidge Farms, Inc.</u>,

_____

<u>Corp.</u>, 957 F. Supp. 749, 754-60 (D. Md. 1997) (no bad faith when the license agreement clearly and unambiguously stated that franchisee can expect no exclusive territory) (collecting similar cases).

[6]  The seminal case in this line is <u>Sheck v. Burger King Corp.</u>, in which the district court, applying Florida law, held that language in the franchise agreement that specifically denied the franchisee "any area, market or territorial rights" did not "imply a wholly different right to Burger King–the right to open other proximate franchises at will regardless of their effect on the Plaintiff's operations." 756 F. Supp. 543, 549 (S.D. Fla. 1991) ("<u>Scheck I</u>"). The district court found that whether the franchisor had breached the implied covenant by granting another franchise in close proximity to the plaintiff's restaurant was a question of fact for the jury.  <u>See</u> <u>Scheck v. Burger King Corp.</u>, 798 F. Supp. 692, 696 (S.D. Fla. 1992) ("<u>Scheck II</u>").  As Sheraton points out, the <u>Scheck</u> cases have been criticized, ignored, and distinguished in a number of subsequent opinions.  <u>See e.g.</u>, <u>Barnes v. Burger King Corp.</u>, 932 F. Supp. 1420, 1437-38 (rejecting the <u>Scheck</u> court's reading of the franchise agreement).  <u>But see</u> <u>In re Vylene Enterprises, Inc.</u>, 90 F.3d 1472, 1477 (9th Cir. 1996) (applying the <u>Scheck</u> reasoning to a franchise contract silent on the issue of exclusive territory).

875 F. Supp. 929, 937-40 (D. Mass. 1995) (describing the trends and collecting cases).

With these broad propositions in place, we turn to the contract in this case. Although the License Agreement appears to provide some guidance with respect to the parties' intentions on this issue, the contract, as executed, says nothing about whether or where Sheraton could establish a competing hotel. Paragraph four of the License Agreement and Schedule B, reproduced below, limit Sheraton Franchise's right to grant additional licenses, but only within the site of the Inn.[7] This language makes it

---

[7] The License Agreement, as executed, provides:

> This license is personal to the Licensee and is restricted to the operation of the Inn on the location specified . . . , and is to be construed to permit only such activities as would normally be incident to the operation of a Sheraton Inn. So long as this Agreement is in effect, the Licensor shall not grant any other license authorizing the use of the name "Sheraton" for hotels, motels or inns located within the licensed area described in

24

clear that Camp Creek had no contractual right to expect the Sheraton Franchise to refrain from licensing the Sheraton name to additional franchises beyond the site of the Inn. Cf. Quality Inns Int'l, Inc. v. Dollar Inns of Amer., Inc., [1992-93 Transf. Binder] Bus. Franchise Guide (CCH) ¶ 10,007 at 23,184 (finding that a non-exclusive franchise agreement implies the possibility of other franchises). By the express terms of the contract, therefore, Sheraton could have authorized a competing franchise directly across the street from the Inn, and Camp Creek would have little recourse. See Piantes, 875 F. Supp. at 937-40 (relying on express language in a contract to reject a claim based on the implied covenant of good faith under Massachusetts law); Shawmut Bank, N.A. v.

---

Schedule B hereto attached.

Schedule B to the License Agreement states: "LICENSED AREA[:] Site Only."

25

<u>Wayman</u>, 606 N.E.2d 925, 928 (Mass. App. Ct. 1993) (rejecting a claim based on the implied covenant of good faith when the plaintiff had expressly waived the protections at issue); <u>see also</u> <u>Clark v. America's Favorite Chicken Co.</u>, 110 F.3d 295, 297-98 (5th Cir. 1997) (rejecting a franchisee's claim that the implied covenant of good faith prevents the franchisor from permitting competition expressly contemplated in the franchise agreement).

Sheraton, however, did not establish such a franchise in this case; instead, it purchased and operated the Gateway on its own behalf. Although the standard form license agreement Sheraton used in its negotiations with Camp Creek contains language addressing Sheraton's ability to compete against the franchisee, the parties deleted that language

from their contract.[8]    Although the parties contest the reason for the deletion, the fact remains that the fully integrated License Agreement[9] is not ambiguous; it is simply silent on the issue of whether or where Sheraton and its affiliates can establish properties that compete against the Inn.  Sheraton's argument that the site-only term dictates the outcome of this case, therefore, is unavailing.    Nor will we accept either party's

---

[8]   The deleted provision of the License Agreement stated:

> The absolute and unrestricted right however is reserved to Sheraton or any subsidiary or affiliate of Sheraton to own, lease, manage, operate, or otherwise be interested in any inn, motel or hotel of any kind in said licensed area operated under the name "Sheraton" or otherwise, either exclusively for its own account or in conjunction with others . . . . The rights of Sheraton or an affiliate to operate in the restricted area as above set forth may be exercised regardless of any competitive effect on the Licensee.

We note that had the parties retained this provision in paragraph four of the contract, by Sheraton's own argument, it, too, would have been limited to the site of the Inn as described in Schedule B.

[9] Paragraph nineteen of the License Agreement contains the following merger clause: "There are no other agreements or understandings, either oral or in writing, between the parties affecting this Agreement . . . . "

27

invitation to imply such language into the contract to decide the issue.

As a result, we must determine whether the implied covenant of good faith and fair dealing, as interpreted by Massachusetts courts, permits the Sheraton to establish its own hotel in the same vicinity as the Inn. The facts of this situation present neither of the extremes that the parties alluded to in their briefs or at oral argument. There can be no doubt, for example, that had Sheraton established its own hotel in Chattanooga, Tennessee, summary judgment would have been appropriate because no reasonable trier of fact could have found that Sheraton had violated its obligation of good faith to Camp Creek. Conversely, we do not face a circumstance in which Sheraton chose to

establish its competing hotel directly across the street from Camp Creek's Inn. Moreover, this case does not lend itself to an easy resolution under the Massachusetts cases that hold against plaintiffs who argue that the implied covenant requires the defendant to protect the plaintiff's interests beyond any measure of commercial reason. See Zapatha, 408 N.E.2d at 1378 (reversing judgment for plaintiff based on the implied covenant of good faith when there was no evidence that the defendant "failed to observe reasonable commercial standards of fair dealing in the trade").[10] This case presents a different situation,

_____

[10] In Waltham Prof., Inc. v. Nutri/System, Inc., [1985-86 Transf. Binder] Bus. Franchise Guide (CCH) ¶ 8479, at 15,917 (D. Mass. 1985), for example, the franchisee unsuccessfully argued that the implied duty of good faith required the franchisor to extend funds to replace the contribution of a recently defunct franchise to a joint-advertising fund so that the other franchisees would not have to increase their contributions. Similarly, in Coraccio v. Lowell Five Cents Sav. Bank, 612 N.E.2d 650, 655 (Mass.

one in which reasonable people could differ over whether Sheraton's conduct, given all the facts and circumstances, violated the duty of good faith and fair dealing.[11]  See In re Vylene, 90 F.3d at 1476.   As a result, summary judgment is inappropriate. [12]

Sheraton further urges, that regardless of whether a reasonable jury could find a violation of their duty to Camp Creek, summary judgment is

_____

1993), the court dismissed a claim that the covenant of good faith, implied in a mortgage contract, required a bank to refrain from granting the plaintiff's husband a second mortgage on property they owned as tenants by the entirety. No reasonable trier of fact could have found a violation of good faith in either case.

[11]  We note that the parties have presented a great deal of conflicting evidence on Sheraton's intentions toward the Inn, which they argue supports the presence or absence of bad faith.  Camp Creek's evidence concerning a number of specific "bad acts" supports an inference of bad faith that is sufficient to withstand Sheraton's motion for summary judgment. See infra Part I(B).

[12]  This is not to say, however, that Sheraton can never avoid a trial on the issue of its good faith when it seeks to open a new hotel near any of its franchisees; Sheraton need only include (or refrain from limiting and deleting) clear language reserving its right to compete against its franchisees in its License Agreements.

nevertheless appropriate because Camp Creek has failed to show damages. In support of this argument, Sheraton emphasizes that the Inn has been more profitable every year since the Gateway opened. Camp Creek, however, has presented evidence of damages through the affidavits of two experts and the Inn's General Manager. These affidavits describe a number of trends present in the market for hotel rooms in the Atlanta area, both before and after Sheraton began operating the Gateway, and present credible theories and measures of damages attributable to the additional intra-brand competition associated with the Gateway's entry to the market. We hold that Camp Creek's evidence is sufficient to

withstand Sheraton's motion for summary judgment on this claim.

## B. Sheraton's Specific "Bad Acts" and the Implied Covenant of Good Faith (Count II)

In addition to the broad allegation that Sheraton breached its implied duty of good faith by competing against the Inn, Camp Creek makes specific additional claims based on discrete incidents that occurred in connection with that competition. None of these claims standing alone, however, survive scrutiny because Camp Creek has failed to present evidence of damages connected to these bad acts. As we discuss below, although many of the acts in question may be probative on the issue of Sheraton's good or bad faith in

32

connection with Count I of the complaint, these acts, even considered in tandem, do not give rise to a claim for breach of the implied duty of good faith.

### 1. The Name Game

The district court granted summary judgment on Camp Creek's claim that Sheraton's decision to require the Inn to drop the "Atlanta Airport" designation from its name violated the implied covenant of good faith and fair conduct. Paragraph five of the License Agreement expressly gave Sheraton the right to approve or disapprove of the Inn's name. Moreover, as Sheraton points out, when it initially gave the Inn permission to change its name to the "Sheraton Inn Atlanta Airport" in 1992, it reserved the right to reconsider that

change should any customer confusion arise. As we noted above, however, a party to an agreement may not use its contractual discretion in bad faith. See Anthony's Pier Four, 583 N.E.2d at 820-21 (finding a violation of good faith when the defendant used its contractual discretion to exact financial concessions from the other party).

Nevertheless, we must affirm the district court's decision on this particular claim because Camp Creek has failed to link any damages to Sheraton's conduct regarding the Inn's name. Although Camp Creek's experts have provided general allegations of lost business, they have not made any attempt to isolate the damages that Camp Creek suffered as a result of the name change from the damages the Inn

34

sustained from additional competition in its market. Camp Creek's evidence on this claim, therefore, while probative on the issue of Sheraton's intent and any bad faith, cannot sustain an independent claim for breach of the implied covenant.[13]

### 2. Playing Favorites

Camp Creek maintains that Sheraton Reservations committed a number of breaches of both the express terms of the Reservation Agreement and the covenant of good faith and fair dealing implied in that contract. Camp

---

[13] Camp Creek has presented evidence that shows that David Proch-Wilson, the Sheraton employee in charge of acquiring the Gateway Hotel, first sought to eject both the Inn and the Hotel from the Sheraton system and then, on December 8, 1992, suggested that Sheraton could solve its concerns about the Inn by changing its name; on January 26, 1993, Proch-Wilson requested the Inn be notified of such a change. Although Sheraton claims its decision on February 2, 1993, to require the Inn to drop "Atlanta Airport" from its name was motivated by customer confusion regarding the preexisting "Sheraton Hotel Atlanta Airport" and has presented evidence that Proch-Wilson had no influence over the decision, Camp Creek has raised issues of material fact regarding Sheraton's intentions.

Creek argues that it has presented evidence to show that Sheraton Reservations agents systematically favored the Gateway Hotel over the Inn when fielding customer calls. Although no provision of the Reservations Agreement specifically addresses this issue, it is clear that the conduct Camp Creek has alleged would deprive the Inn of the benefits of the contract (i.e. reservations) and therefore breach the covenant of good faith inherent in that agreement. Again, however, we affirm the district court's decision to grant summary judgment on this claim because Camp Creek has failed to provide any evidence or theory to connect any damages to this particular claim. Sheraton, on the other hand, has presented evidence to demonstrate that the number of

36

reservations the Inn received through the Reservatron system actually increased in every year after the Gateway opened. As a result, Camp Creek's claim for a breach of the implied covenant must fail.[14]

### 3. Misuse of Confidential Information

Next, we consider Camp Creek's claim that Sheraton Reservations improperly supplied confidential, competitively sensitive information about the Inn's reservations and pricing structure to the Gateway. The evidence shows that Tom Faust, manager of the Gateway, had access to such confidential information

---

[14] Once again, Camp Creek should be able to use its evidence of favoritism on remand to attempt to demonstrate Sheraton's alleged bad faith. Although Camp Creek's 289 test-calls do not constitute anything approaching a scientific survey, we note that, contrary to the district court's opinion, it does not violate the rule against hearsay. See Fed. R. Evid. 801(c) (defining hearsay as testimony offered for the truth of the matter asserted); Fed. R. Evid. 801(d)(2)(D) (excluding statements made by an authorized agent from the definition of hearsay).

regarding the Inn, in breach of Sheraton's own procedures.  Although Sheraton admits that Faust improperly used the information to propose the Inn's elimination from the Atlanta Airport market, Sheraton contends that Faust's proposal fell on deaf ears and that, as a result, Camp Creek can show neither prejudice nor damage from this breach of confidentiality.  As Camp Creek has failed to contradict Sheraton with evidence of damages it suffered in connection with Faust's proposal, we affirm the district court's grant of summary judgment.  Similarly, Camp Creek has failed to provide sufficient evidence of damages with respect to its allegation that the Gateway used this misappropriated information to restructure its own rates to compete against the Inn. Although Camp Creek points to a conclusory statement

from one of its experts to the effect that the Gateway's use of the information damaged the Inn, see Berman Aff. at ¶ 31, no reasonable jury could distinguish, on the sole basis of this evidence, between losses the Inn suffered because of the improper use of its confidential information and those due to the simple increase in intra-brand competition. See Liberty Lobby, Inc., 477 U.S. at 249-50, 106 S. Ct. at 2511 (summary judgment appropriate when non-movant's evidence is "merely colorable"). Accordingly, we affirm the district court's grant of summary judgment in favor of Sheraton on this issue.[15]

---

[15] This is not to say that Camp Creek may not present its evidence on this issue at trial, as it is plainly probative on the issue of whether Sheraton acted in bad faith towards its franchisee.

## D. Billing Disputes (Count X-A)

Next, we consider Camp Creek's claim that Sheraton Reservations breached the Reservations Agreement by over-billing the Inn in connection with reservations made by American Airlines' SABRE reservations system. The parties do not contest the error, nor do they dispute that Sheraton Reservations eventually corrected the problem once Camp Creek brought the matter to its attention. What remains in dispute, however, is whether the Inn received the full amount of credit to which it was entitled. Camp Creek presents deposition testimony of the Inn's general manager to the effect that Sheraton Reservations should have credited the Inn approximately $1,800 more than it received. See I Sunderji Dep. at 202-03. As material facts appear to be in dispute on this issue, Camp Creek has presented evidence sufficient to survive summary judgment.

No issue of material fact, however, remains on Camp Creek's claim that its reservations service was interrupted for a

period of time. Sheraton Reservations has presented evidence that it stopped making reservations for the Inn due to a computer software problem. Although Camp Creek denies this explanation, it has presented no alternative, actionable theory for the interruption. As the district court correctly noted, paragraph seven of the Reservations Agreement contains an express indemnity provision stating that neither Sheraton Reservations nor any of its parent or affiliated companies may be held liable for "THE INTERRUPTION OR MALFUNCTIONING OF THE SYSTEM, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY." This provision establishes that Camp Creek waived any and all claims to recover damages for an interruption in the Sheraton Reservations system. As Camp Creek has not rebutted Sheraton's argument with any evidence or theory that would permit recovery, we affirm the district court's grant of summary judgment on this issue. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (holding that once the movant makes a

41

sufficient showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts.").

## II. Tortious Interference with Contract and Business Relations (Count III)

Camp Creek also claims that Sheraton tortiously interfered with its contracts with guests and its business relations. The parties agree that Georgia law governs Camp Creek's claims for tortious interference. Camp Creek claims that the defendants interfered with (1) Camp Creek's License Agreement and Reservations Agreement; (2) the Inn's contracts with its customers; and (3) the Inn's prospective customer relationships.

Camp Creek's allegations of tortious interference with contract and business

42

relationships state two independent but related claims.  See Renden, Inc. v. Liberty Real Estate Ltd. Partnership III, 444 S.E.2d 814, 817 (Ga. App. Ct. 1994).  The claims share the following key elements:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third-parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff."

Disaster Services Inc. v. ERC Partnership, No. A97A2183,  (Ga. App. Sept. 8, 1997); see also Sweeney v. Athens Reg'l Med. Ctr., 709 F. Supp. 1563, 1577-78 (M.D. Ga. 1989) (stating the elements of tortious interference with contract); Hayes v. Irwin, 541 F. Supp. 397, 429 (N.D. Ga. 1982)

(stating the elements of tortious interference with business relationships).

## A.    The License and Reservations Agreements

First, we address Camp Creek's claim that ITT Sheraton and the Sheraton Savannah tortiously interfered with the License Agreement and Reservations Agreement. A review of Camp Creek's allegations and the evidence reveals that only Sheraton Savannah's role as the owner of the Gateway Hotel and its competition against the Inn can support a claim for tortious interference with contract under Georgia law.[16] We must decide, therefore,

---

[16] Camp Creek's evidence of misuse of confidential information, an improper change in the Inn's name, and favoritism in the Reservatron system implicates Sheraton Franchise, Sheraton Reservations, and ITT Sheraton. Sheraton Franchise and Sheraton Reservations, as parties to the License and Reservation Agreements, cannot tortiously interfere with those contracts. See SunAmerica Fin. v. 260 Peachtree St., 415 S.E.2d 677, 684 (Ga. App. 1992)(collecting cases). Moreover, since we have already held that

44

whether Sheraton Savannah's competition in the Atlanta Airport market constitutes a tort, independent of the parties' contractual obligations.

At the outset, it is worth noting that simple competition for guests between hotels ordinarily does not give rise to an actionable tort claim. See Hayes, 541 F. Supp. at 430 (describing the competitive privilege). Camp Creek would have no basis to complain, for example, if the Marriott Corporation established a hotel in the Atlanta Airport area and began competing with the Inn for customers. Camp Creek argues that its franchise relationship with Sheraton requires

ITT Sheraton was interested in these contracts and was bound by duties implied thereunder, see supra note 4, we cannot disassociate ITT Sheraton from the agreements for purposes of the foregoing analysis. ITT Sheraton, therefore, is not a stranger to the contracts, and Georgia law precludes a finding of tortious interference with the License and Reservations Agreements. Id.

a different result in this case, citing <u>Hayes</u> for the proposition that once two entities have agreed to pursue business together they may not then tortiously interfere with each other's pursuit of that business. <u>See also DeLong Equip. Co. v. Washington Mills Abrasive Co.</u>, 887 F.2d 1499, 1518-19 (11th Cir. 1989) (privilege defense unavailable where interference is achieved by violating a confidential relationship). The <u>Hayes</u> court did indeed reject the invocation of the competitive privilege in a case where one of the principals in a two-person partnership contacted his partner's clients in an attempt to discredit him and deprive him of their business. <u>See Hayes</u>, 541 F. Supp. at 430-31. A franchise relationship, however, is distinguishable from

46

the partnership at issue in the <u>Hayes</u> case.  <u>See</u> <u>Capital Ford Truck Sales, Inc. v. Ford Motor Co.</u>, 819 F. Supp. 1555, 1579 (N.D. Ga. 1992) (collecting cases that find no fiduciary relationship between franchisor and franchisee).    The agreements establishing the franchise relationship in this case make it very clear that Camp Creek is only one of a vast number of hotels in the Sheraton system and that Sheraton and Camp Creek are not engaged in a partnership to pursue business in the Atlanta Airport market.[17]    Moreover, Camp Creek has failed to provide any evidence of unique circumstances that might support the proposition that the parties intended to create a confidential or fiduciary relationship.[18]  <u>See</u> <u>Allen</u>

---

[17]  In fact, paragraph eight of the License Agreement expressly disclaims any such partnership.

[18]  This conclusion also disposes of Camp Creek's claim for unfair competition under Georgia common law (Count V), which

v. Hub Cap Heaven, Inc., 484 S.E.2d 259, 264 (Ga. App. 1997) (standard franchise relationship does not present a fiduciary relationship); Kienel v. Lanier, 378 S.E.2d 359, 361 (Ga. App. 1989) (no fiduciary relationship where parties' agreement provided for the pursuit of separate business objectives). Although we have held that a reasonable jury could find that Sheraton's competition against Camp Creek violated the contractual obligations between the parties, we decline to convert such a claim into an independent claim for tort. We hold that Sheraton's choice to compete against the Inn was subject to the competitive privilege and was not "improper" or "wrongful" in the sense used in Georgia's cases on tortious interference

---

depends on the argument that Sheraton abused and exploited a confidential relationship between the parties.

with contract. We affirm the district court's grant of summary judgment on this issue.

## B. Customer Contracts and Relationships

Second, we consider Camp Creek's allegation that Sheraton interfered with the Inn's contracts and prospective business relationships with its customers. In support of this claim, Camp Creek offers testimony to the effect that almost 300 guests with reservations at the Inn actually stayed at the Gateway. Camp Creek claims that these guests boarded the wrong Sheraton shuttle van at the Atlanta Airport and, when they arrived at the wrong hotel, the Gateway knowingly misappropriated

a large percentage of these guests by offering them rates below the Inn's reservation rates and below the Gateway's "walk in" rate.

As noted above, Georgia law requires a plaintiff to offer evidence that the defendant acted improperly and that those acts induced a breach of contract or prompted a third party to discontinue or fail to enter an anticipated business relationship.[19]  See McDaniel v. Green, 275 S.E.2d 124, 126-27 (Ga. App. 1980) (requiring a causal connection between the improper act and the interrupted relationship). Although Camp Creek has presented evidence that Sheraton engaged in a host of improper actions, none of those actions relate

---

[19]  It is by no means clear that the reservations at issue constitute a contract under Georgia law.  See Brown v. Hilton Hotels Corp., 211 S.E.2d 125, 127 (Ga. App. Ct. 1974) (permitting a guest to sue for breach of contract when the hotel refused to honor a *prepaid* reservation).  We need not reach the question in this case.

to the misappropriation of these (or any other) customers with reservations. Indeed, given that these customers initially made reservations at the Inn, the evidence suggests that any omission of the Atlanta Airport designator from the Inn's name in Sheraton's national advertising and the Reservatron system,[20] any bias in the Reservatron system, and any misuse of the Inn's confidential information to restructure the Gateway's rates had no impact whatsoever. The evidence, construed in Camp Creek's favor, merely shows that the Gateway offered to meet or beat the Inn's rates when these guests arrived at their door. As Camp Creek has presented no evidence that suggests these guests canceled their reservations at the Inn because of the Gateway's alleged wrongful activity, we affirm

---

[20] Camp Creek admits that it never actually changed the appearance of its vans to comply with Sheraton's demand that it change the Inn's name. As a result, the only way Sheraton could have confused these 300 customers at the airport was by using its own name in connection with the Gateway.

the district court's grant of summary judgment on this issue.

Camp Creek's remaining evidence of tortious interference supports only the general contention that Sheraton's improper conduct cost Camp Creek guests who might have otherwise stayed at the Inn. Although a plaintiff claiming tortious interference with prospective business relationships need not identify particular disrupted contracts to recover, Camp Creek has presented no evidence to distinguish between guests who chose not to stay at the Inn as a result of Sheraton's bad acts and those who simply rejected the Inn because the Gateway presented a more attractive (or simply an additional) choice. Camp Creek's failure to identify a causal connection between

52

Sheraton's tortious activity and the interruption of any particular business relationship requires us to affirm the district court's grant of summary judgment.  See Hayes, 541 F. Supp. at 429 ("plaintiff must demonstrate that absent the interference, those relations were reasonably likely to develop in fact."); McDaniel, 275 S.E.2d at 126-27.

### III    The Massachusetts Unfair Trade Practices Act (Count IV)

Next, we address Camp Creek's claim that the defendants violated the Massachusetts Unfair Trade Practices Act.  See Mass. Gen. Laws ch. 93A (the "Massachusetts Act").  As the district court correctly observed, that statute applies only to cases in which "the actions and transactions constituting the alleged unfair

method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth [of Massachusetts]." Id. § 11. Sheraton, as the party seeking to rely on this provision, bears the burden of establishing that its conduct falls outside the Massachusetts Act's reach. Id.[21]

To determine whether the conduct in a particular case took place "primarily and substantially" within Massachusetts, the courts have examined: (1) where the defendant committed the deceptive or unfair acts; (2) where the plaintiff was deceived and acted upon the defendant's unfair acts; and (3) where the plaintiff suffered

---

[21] Camp Creek's suggestion that Sheraton should not be heard to complain about the application of the Massachusetts Act because it requires its franchisees to sign agreements governed by Massachusetts law is also unpersuasive. See e.g., Popkin v. National Benefit Life Ins. Co., 711 F. Supp. 1194, 1200 (S.D.N.Y. 1989) (dismissing a contractual choice of law argument as irrelevant to this inquiry).

losses caused by the defendant's unfair acts. See Play Time, Inc. v. LDDS Metromedia Communications Inc., 123 F.3d 23, 33 (1st Cir. 1997). In the present case, the second and third prongs of the test favor Sheraton, because Camp Creek felt the "sting" of any deception in Atlanta, Georgia. See Clinton Hosp. Ass'n v. Corson Group, Inc., 907 F.2d 1260, 1266 (1st Cir. 1990) (applying Bushkin Assoc., Inc. v. Raytheon Co., 473 N.E.2d 662 (Mass. 1985)).

Camp Creek, therefore, relies on the first prong of the analysis and argues that the appellees acted in Massachusetts because Sheraton made all the plans and decisions at issue at its corporate headquarters in Boston. Camp Creek's argument, however, overlooks

the fact that, although Sheraton's contemplation of these acts may have taken place in Massachusetts, the acts themselves took place outside the Commonwealth.[22] Moreover, the proposition that Camp Creek advances would require the application of the Massachusetts Act in every case involving a Massachusetts defendant, a proposition the courts have rejected. See Clinton Hosp., 907 F.2d at 1266 (rejecting bright line rules); Healthco Int'l, Inc. v. A-Dec, Inc., No. 87-0235-S, (D. Mass. Apr. 17, 1989) (reading Bushkin to reject the argument that the Massachusetts Act applies to every defendant resident in Massachusetts). We therefore

---

[22] The acts Camp Creek cites include the name change (nationwide), misuse of confidential information (Atlanta), misleading advertisements (nationwide), and preferential treatment in the Reservatron system (nationwide).

affirm the district court's grant of summary judgment on this issue.[23]

**IV Georgia Trade Secrets Act (Count X)**

Camp Creek also asserts that Sheraton misappropriated confidential information regarding the Inn in violation of the Georgia Trade Secrets Act ("GTSA"). See O.C.G.A. § 10-1-760 et seq. The record shows that Tom Faust, the manager of the Gateway Hotel, improperly came into possession of information concerning the Inn's occupancy levels, average daily rates, discounting policies, rate levels, long term contracts, marketing plans, and

---

[23] Our application of this express limitation found in the Act renders unnecessary any determination of whether a Georgia court, applying Georgia principles of conflicts of law, would apply the Massachusetts Act at all. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021, 85 L. Ed. 1447 (1941) (holding that a federal court hearing a diversity case applies the conflicts of law rules of the state in which it sits).

operating expenses. Camp Creek also presented evidence that Faust used this information to propose the Inn's ejection from the Sheraton system and that he may have used it to compete against the Inn for customers.

To support a claim for misappropriation of trade secrets, Camp Creek must show that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret. See generally, DeGiorgio v. Megabyte Int'l, Inc., 468 S.E.2d 367 (Ga. 1996) (applying O.C.G.A. §§ 10-1-761, 763). Georgia defines trade secrets broadly to include non-technical and financial data that derives economic value from not being generally known and is the subject of reasonable efforts to

maintain its secrecy. Id. § 10-1-761(4).[24] Whether a particular type of information constitutes a trade secret is a question of fact. See Salsbury Lab. v. Merieux Lab., 908 F.2d 706, 712 (11th Cir. 1990) (citing Wilson v. Barton & Ludwig, 296 S.E.2d 74, 78 (Ga. App. Ct. 1982)). Our review of the record reveals that Camp Creek has provided evidence upon which a reasonable jury could find that the

---

[24] The Georgia Trade Secrets Act provides in pertinent part:

"Trade secret" means information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
    (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
    (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4). We note that although the Georgia State Legislature amended this provision in July 1996, the amended language plays no part in our decision. Compare AmeriGas Propane L.P. v. T-Bo Propane, Inc., 972 F. Supp. 685, 697-98 (S.D. Ga. 1997) (discussing the amendment and its intended effect).

information in this case meets Georgia's statutory definition of a trade secret.

First, Camp Creek has presented expert testimony suggesting that this information is closely guarded in the hotel industry, that a competitor could not easily derive the information through other means, and that a competitor could make use of such information to the detriment of the owner. See Berman Aff. ¶ 29. This evidence shows that the information is valuable and not of the type any intelligent competitor could have compiled by legitimate alternative means. Second, although Camp Creek did provide the information to Sheraton, it provided that information pursuant to the Reservation Agreement and on the apparently mutual understanding that it would be kept

confidential. <u>See</u> Sunderji Aff. Exh. C (Sheraton representative's letter noting that information would be "kept in strict confidentiality").[25] To the extent Camp Creek disclosed this type of information elsewhere, it did so on the express condition that it would not be made public except as part of aggregate industry statistics, untraceable to the individual Inn. Whether Camp Creek's efforts to keep the information secret in this case were "reasonable under the circumstances" presents a question for the trier of fact. <u>Cf.</u> <u>Avnet, Inc. v. Wyle Lab. Inc.</u>, 437 S.E.2d 302, 303-04 (Ga. 1993) (comparing and analyzing different measures

---

[25] We are cognizant of the fact that not all confidential information rises to the level of a trade secret. <u>See</u> <u>TDS Healthcare Sys. Corp. v. Humana Hosp. Ill., Inc.</u>, 880 F. Supp. 1572, 1584 (N.D. Ga. 1995). Nevertheless, Camp Creek's evidence on this point is more than sufficient to survive Sheraton's motion for summary judgment.

taken to secure secrecy of confidential information).

Camp Creek's evidence would also support a finding that Sheraton misappropriated the information from Camp Creek.[26] A defendant misappropriates a trade secret by knowingly acquiring it through improper means. See O.C.G.A. § 10-1-761(2). The GTSA provides that:

> "Improper means" includes theft, bribery, misrepresentation,

---

[26] The GTSA provides the following definition of misappropriation in pertinent part:
(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
. . . .
(ii) At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
. . . .
(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; . . . .
O.C.G.A. § 10-1-761(2).

> breach or inducement of a breach of a confidential relationship <u>or other duty to maintain secrecy or limit use</u> . . . .

<u>Id.</u> § 10-1-761(1) (emphasis added). Although we have already held that Camp Creek has failed to show that a confidential relationship existed between the parties, the evidence shows that Camp Creek provided the data in question to Sheraton Reservations with the understanding that its use would be limited and that it would be kept confidential. Sheraton contends that it came into possession of the information by legitimate means, either compiling the data itself or receiving it pursuant to the Reservations Agreement. Although this may accurately describe Sheraton Reservations' initial receipt of the information,

Sheraton has all but admitted that the Gateway's possession and use of the data, as one of Camp Creek's competitors, was improper and in violation of Sheraton's own policies. See e.g., III Johnson Dep. at 380 (discussing procedures); I Faust Dep. at 220-25 (discussing the Gateway's acquisition and use of the Inn's confidential information). As the GTSA includes the diversion of information acquired under legitimate circumstances within its definition of misappropriation, see O.C.G.A. §§ 10-1-761(1), 10-1-761(2)(B)(ii)(II) & (III), Camp Creek has presented evidence which would allow a reasonable jury to find in its favor on this claim.

Although Camp Creek has presented evidence that the defendants made some

competitive use of the information, Sheraton maintains that Camp Creek has failed to provide evidence of damages on its trade secret claim. As we have already noted, Camp Creek's generalized evidence on damages does not isolate losses directly attributable to any particular misuse of confidential information. <u>See</u> <u>supra</u> Part I(B)(3). Nevertheless, the GTSA expressly provides for the award of a reasonable royalty in the event that the plaintiff cannot prove damages or unjust enrichment by a preponderance of the evidence. <u>See</u> O.C.G.A. § 10-1-763(a). Moreover, the district court may determine that injunctive relief is appropriate to the extent that the Gateway continues to make use of Camp Creek's confidential information to compete for

guests.  <u>See</u> O.C.G.A. § 10-1-762.  Judgment as a matter of law, therefore, is inappropriate at this time, and we reverse the district court's grant of summary judgment.

## V    Additional Statutory Claims

Camp Creek's complaint goes on to assert a number of additional statutory claims for relief, relying again on the conduct described above.  We provide a brief discussion of each claim.

### A.    Lanham Act and Georgia Deceptive Trade Practices Act (Counts VI & VII)

Camp Creek sets forth a rather novel argument that Sheraton's use of the words "Sheraton . . . Atlanta Airport" in connection with the Gateway Hotel constitutes a violation of the

Lanham Act. <u>See</u> 15 U.S.C. § 1125(a). As it is "hornbook law" that a licensee may not sue its licensor for trademark infringement, <u>see</u> 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 18:63, at 18-103 (4th ed. 1996), and any Lanham Act plaintiff must have rights in the name at issue to seek protection, <u>see</u> <u>ConAgra, Inc. v. Singleton</u>, 743 F.2d 1508, 1512 (11th Cir. 1984), Camp Creek eschews any claim to the term "Sheraton" alone. Instead, Camp Creek claims a property interest in the use of "Atlanta Airport" in combination with Sheraton and alleges that the defendants engaged in "reverse palming off," trading on the goodwill that Camp Creek had acquired in the combination of the two terms.

Although we see a host of difficulties with Camp Creek's argument, we, like the district court, will confine our discussion of this matter to whether the defendant's designation was actually false. As even the title of section 1125 makes clear, Camp Creek must provide *some* evidence that the defendants falsely

designated the Gateway Hotel in *some* way.[27]  As the district court correctly observed, there can be no Lanham Act claim if the Gateway's use of "Sheraton . . . Atlanta Airport" is accurate and creates no false impression.  See Original Appalachian Artworks v. Schlaifer Nance & Co., 679 F. Supp. 1564, 1577 (N.D. Ga. 1987) ("If there is one immediately apparent characteristic of section 1125, it is that in order to sustain a cause of action thereunder, a plaintiff must establish the existence of some type of false designation, description, or representation. The operative word is 'false.'"); Debs v. Meliopoulos, No. 1:90-cv-939-WCO, (N.D. Ga. Dec. 18, 1991) (noting that relief may be granted if the defendant creates "a false impression").  It is beyond dispute that the Gateway is a Sheraton property located in the vicinity of the Atlanta Airport and its use of the disputed terms is literally accurate.  See Original Appalachian Artworks, 679 F. Supp. at

---

[27]  The title of that section is "False designations of origin and false descriptions forbidden."  Moreover, although we would never have discovered it by reading Camp Creek's briefs on this issue, § 1125(a) uses the word "false" or some derivation thereof no less than six times.  See 15 U.S.C. § 1125(a).

1577-78 (rejecting a section 1125(a) claim when the challenged association was factually accurate). As we find nothing "false" about the defendant's use of "Sheraton . . . Atlanta Airport," we affirm the district court's grant of summary judgment in favor of the defendants on the Lanham Act claim.[28] Moreover, as the parties do not dispute that Georgia's Deceptive Trade Practices Act, O.C.G.A. § 10-1-372, involves "the same dispositive question" as the Lanham Act claim, we similarly affirm the district courts disposition of that claim. See <u>Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.</u>, 716 F.2d 833, 839 (11th Cir. 1983).

---

[28] Indeed, the only way that the Gateway's use of "Sheraton . . . Atlanta Airport" could create a false or misleading impression is if potential guests associated those terms with the Inn. Camp Creek has not only failed to produce any evidence of such a particular association, but the prior existence of the SHAA and the evidence of customer confusion between those franchises contradicts any such suggestion.

We also reject Camp Creek's conceptually befuddled suggestion that the Gateway has engaged in "reverse passing off." Section 1125(a) prohibits both "passing off," where A sells its product under B's name, and "reverse passing off," where A sells B's product under A's name. See <u>Waldham Pub. Corp. v. Landoll, Inc.</u>, 43 F.3d 775, 780 (2d Cir. 1994). Although Camp Creek's evidence <u>might</u> be read to show that the Gateway sold its own rooms using the goodwill the Inn had built up in its name (passing off), there is no evidence to support the proposition that the Gateway sold the Inn's product (reverse passing off). See <u>Debs</u>, (collecting cases and fact patterns).

## B. Additional Prayers for Relief

Camp Creek maintains that in addition to its claims for damages on the counts discussed above, it has independent claims for unjust enrichment, injunctive relief, punitive damages, and attorneys fees. We address each argument in turn.

### 1. Unjust Enrichment (Count IX)

Camp Creek argues that, under both Massachusetts and Georgia law, "a person who has been unjustly enriched at the expense of another is required to make restitution." See Salamon v. Terra, 477 N.E.2d 1029, 1031 (Mass. 1985) (quoting Restatement of Restitution § 1(1937)); Regional Pacesetters, Inc. v. Halpern Enter., Inc., 300 S.E.2d 180, 184-5 (Ga. App. 1983). Camp Creek asserts that the facts in this case support its argument that the Gateway unjustly enriched itself by competing with the Inn for business in the Atlanta Airport market. As

previously discussed, Camp Creek may recover damages from the defendants to the extent that a jury determines that the Gateway's competition constitutes a breach of the defendants' implied contractual duties. Recovery on a theory of unjust enrichment, however, is only available "when as a matter of fact there is no legal contract." See Regional Pacesetters, 300 S.E.2d 180, 185 (Ga. App. 1983). As a result, the district court properly granted summary judgment to the defendants.

### 2.  Injunctive Relief (Count VIII)

The district court seems to have misconceived Camp Creek's claim for an injunction pursuant to Georgia law, see O.C.G.A. § 9-5-1, as a demand for a preliminary injunction. Consequently, regardless of whether the district court's observation that Fed. R. Civ. P. 65 precludes Camp Creek's application for an injunction under state law is correct,[29] the district court erred by applying the

---

[29] We note that the district court's conclusion in this regard is unsupported by citation, but decline to address the matter further.

standards governing temporary injunctions. In view of the fact that Camp Creek's petition is for a permanent injunction, to be decided at the conclusion of a trial on the merits, the district court's reliance on plaintiff's likelihood of success on the merits is misplaced. We therefore reverse the district court's grant of summary judgment in Sheraton's favor on this issue.

### 3. Attorney's Fees, Punitive Damages, and Discovery Matters (Count XI)

The district court's resolution of Camp Creek's claims for attorneys' fees, punitive damages, and its motion to compel discovery depend, at least to some degree, on the conclusion that Sheraton was entitled to summary judgment on all of Camp Creek's substantive claims. Our determination that Camp Creek has set forth evidence sufficient to present to a jury on its contract and GTSA claims requires us to vacate the district court's denial of these prayers for relief and remand for reconsideration of Count XI in light of our opinion.

## CONCLUSION

As we noted at the outset of this opinion, Camp Creek's long and interwoven claims for relief reduce to the basic proposition that Sheraton violated a variety of duties it owed to its franchisee. Upon careful consideration of the arguments, we reverse the district court's order granting summary judgment in Sheraton's favor with respect to Camp Creek's claims for: (1) breach of the implied covenant of good faith and fair dealing under Massachusetts law in connection with Sheraton's establishment and operation of the Gateway Hotel; (2) reimbursement from Sheraton in connection with the American Airlines SABRE reservation system billing error; (3) violation of the GTSA; (4) injunctive relief; and (5) attorneys' fees and

73

punitive damages (Counts I, X-A, X, VIII & XI). We also vacate the district court's denial of Camp Creek's motions to compel discovery. We affirm the district court's decision with regard to Camp Creek's claims for: (1) breach of the implied covenant of good faith and fair dealing in connection with Sheraton's individual bad acts; (2) damages caused by the interruption of service from Sheraton's Reservatron system; (3) tortious interference with contracts and business relationships; (4) violation of the Massachusetts Unfair Trade Practices Act; (5) Unfair Competition; (6) the Lanham Act; (7) the Georgia Unfair Trade Practices Act; and (8) Unjust Enrichment (Counts II, X-A, III, IV, V, VI, VII & IX). Accordingly, we AFFIRM in part, REVERSE in

part, and REMAND this case to the district court for further proceedings consistent with this opinion.